**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EMILE DEWEAVER,
          *Petitioner-Appellant,*

          v.

DAVID L. RUNNELS, Warden, High
Desert State Prison,
          *Respondent-Appellee.*

No. 06-16865

D.C. No.
CV-03-00839-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued and Submitted
November 21, 2008—San Francisco, California

Filed February 25, 2009

Before: Procter Hug, Jr., John T. Noonan and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Hug

**COUNSEL**

Mary E. Pougiales, Novato, California, for the petitioner-appellant.

Juliet B. Haley, Deputy Attorney General, San Francisco, California, for the respondent-appellee.

**OPINION**

HUG, Circuit Judge:

Emile DeWeaver petitions for habeas relief arguing that the California Court of Appeal erroneously concluded that he did not invoke his right to remain silent during interrogation, his confession was voluntary, and the state trial court's interactions with the jury did not coerce a verdict. For DeWeaver to succeed, he must overcome the high standard of deference to a state-court decision mandated by the Antiterrorism and Effective Death Penalty Act (AEDPA), under which a state-court decision may not be reversed unless it is contrary to or an unreasonable application of clearly established Supreme Court precedent, or if it was based on an unreasonable factual determination. 28 U.S.C. § 2254(d). DeWeaver cannot overcome this hurdle, and we therefore affirm the district court's denial of DeWeaver's petition.

## I.  Standard of review

We review the federal district court's decision to deny DeWeaver's habeas petition de novo. *See Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc). "When reviewing a state court's analysis under AEDPA, this court looks to the last reasoned decision' as the basis for its judgment." *Forn v. Hornung*, 343 F.3d 990, 995 (9th Cir. 2003) (quoting *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). In this case, because the California Supreme Court denied DeWeaver's appeal without citation or comment, we look to the California Court of Appeal's decision as the basis for the state's judgment. *See Taylor v. Maddox*, 366 F.3d 992, 999 n.5 (9th Cir. 2004). Insofar as the state appellate court adopted the reasoning of the state trial court, we also consider the trial-court decision. *See id.*

An application for writ of habeas corpus shall not be granted unless the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state-court decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite the Supreme Court's or concludes differently on an indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The state court need not have cited Supreme Court precedent or been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." *Early v. Packer*, 537 U.S. 3, 8 (2002). The state court unreasonably applies clearly established federal law if it "either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Hernandez v.*

*Small*, 282 F.3d 1132, 1142 (9th Cir. 2002); *see also Williams*, 529 U.S. at 408-09. We must defer to the state court's factual findings unless a defect in the process is so apparent that "any appellate court . . . would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor*, 166 F.3d at 1000.

## II.   DeWeaver's confession

DeWeaver argues that the state appellate court decided contrary to federal law when it concluded that he had not invoked his right to remain silent. He contends that by asking to go back to his jail cell, he invoked his privilege against self incrimination. At that point, DeWeaver argues, under *Miranda v. Arizona*, 384 U.S. 436 (1966), police were required to cease the interrogation and return him to the jail. He then argues that even if there was no violation of *Miranda*, his confession was involuntary because of the coercive techniques used by the police interrogators. We first address DeWeaver's argument that the police officers violated the rule in *Miranda*, and then his argument regarding the voluntariness of his statement.

## A.   Factual and procedural background

DeWeaver and another man were charged with first-degree murder, and DeWeaver was charged with attempted first-degree murder for two shootings in Oakland, California. Two days after the shootings, police encountered DeWeaver smoking marijuana in a parked car. In the car, officers discovered narcotics and two loaded handguns; they arrested DeWeaver for possession of the drugs and firearms and informed him of his rights under *Miranda*. DeWeaver told the officers that he did not wish to give a statement and he was not questioned at that time.

Over the course of two or three days, testing revealed that the bullets recovered from the shootings in Oakland had been

fired by the guns found with DeWeaver in the car, and witnesses to the shootings identified DeWeaver as a shooter in photographic line-ups. Homicide Sergeant Ersie Joyner transported DeWeaver from the jail to the police department to question him about the shootings. Sergeant Joyner and DeWeaver both testified that on the morning of the interrogation, DeWeaver was picked up by a police officer at North County jail and driven to the police station where he was placed in an interrogation room. Police officers asked DeWeaver if he would like something to eat, brought him some food, and left him alone in the interrogation room for an hour before beginning the interview. At this point, the two accounts diverge.

DeWeaver testified that as soon as the officers entered the interrogation room, he asked them if they were Alcohol Tobacco and Firearms agents. When they said no, they were homicide detectives, DeWeaver remembered immediately replying, "I don't want to talk to you." When the detectives asked him why, DeWeaver testified that he told them: "I don't want to talk to you, you're homicide detectives, you investigate homicides." He could not remember what Joyner said in response, but testified that he then asked them to "take [him] back to North County." According to DeWeaver, Joyner "asked me to hear him out, and after I finish hearing him out, if I still want to go back to North County he'd take me."

DeWeaver's account continued with Joyner telling him that the guns with which he had been arrested were linked to the shootings, numerous witnesses had identified him as the shooter, and the person who drove him to the scene of the shooting had confessed. At that point, DeWeaver said he felt confused and scared; he did not know what to do or what to think. But he asked to see the photographic line-ups from which the witnesses had identified him. He testified that he looked at them and then said, "Okay, I heard you out and I want to go back to North County now."

Although he was unclear of the timing, he testified that he repeatedly asked to make a phone call, to go back to jail, and told the interrogators that he did not want to talk to them. Overall, DeWeaver attempted to paint a picture of a coercive interrogation, even going so far as to testify, "by the time I made that statement, I no longer had the decision making skills to refuse to do it because it was like, I guess I feel like my will was overborne." He said that he was overwhelmed with fear for his girlfriend, their unborn child, his father, and his brother because one of the victim's family members might retaliate. DeWeaver alleged that Joyner told him if he made a statement the police could protect his family. DeWeaver also claimed that Joyner told him that if he did not make a statement he would look like a cold-blooded killer, but that if he did the judge might be lenient.

In contrast, Joyner described a non-remarkable police interrogation. Joyner testified that he and his partner came into the interview room, talked to DeWeaver about his name, birth date, and living arrangements. Joyner then admonished DeWeaver of his *Miranda* rights by reading to him from the standardized form prepared by the Oakland Police Department. DeWeaver waived his rights by initialing the form next to the waiver statements and wrote the time of the waiver next to his initials.

According to Joyner, DeWeaver never said that he did not want to talk to the officers, but he did ask to go back to jail. At the preliminary hearing, Joyner testified that, when they started discussing the shootings in more detail, DeWeaver appeared upset that he would be spending his fifth birthday in a row in jail and asked to be returned to jail. At the *Miranda* hearing, Joyner was less clear about the timing of the request, but said that DeWeaver appeared reluctant to confront the evidence against him. In response, Joyner conveyed that returning to jail was not going to make the situation go away. He asked DeWeaver to hear him out and told him if he still wanted to return to jail, Joyner would take him.

Like DeWeaver, Joyner testified that he told DeWeaver that the guns with which he been arrested fired the bullets from the shootings, a witness had identified him as the shooter, and the person who had been driving DeWeaver the day of the shooting was at the station being questioned at the same time. But, according to Joyner, he never threatened DeWeaver or discussed possible sentences. He never promised DeWeaver leniency if he cooperated. He emphasized that he was seeking the truth and encouraged DeWeaver to tell his side of the story.

In the beginning, Joyner described DeWeaver as appearing comfortable, but as the interrogation continued, and the officers began asking questions relevant to shootings, DeWeaver became slightly nervous. At times he was very quiet, other times he was very talkative. At some point during the interrogation, DeWeaver expressed regret that he might be going to jail and would not see his long-time girlfriend or their baby, with whom she was pregnant. He expressed concern about retaliation against his father and his brother, but Joyner denied offering to protect DeWeaver's family if DeWeaver made a statement.

Joyner's notes reflected that he took one break during the interrogation, when DeWeaver asked for a moment by himself to think. Joyner and his partner left the room for about ten minutes and when they returned, DeWeaver asked to see the photographic lineup from which he had been identified. Within five minutes, DeWeaver began confessing his involvement in the shootings.

After DeWeaver had discussed the shootings with Joyner, the officers tape-recorded DeWeaver's statement. Joyner began the tape-recording by recounting the *Miranda* warnings he had given DeWeaver earlier and asking DeWeaver to acknowledge them. Joyner asked DeWeaver to describe the events of the shooting and DeWeaver did so. However, DeWeaver refused to name the person who drove him to the

shooting or the other shooter, referring to them as John 1 and John 2. Otherwise, throughout the taped statement, DeWeaver responded to all of the officers' questions without hesitation. At the end of the tape, Joyner asked DeWeaver if any threats or promises had been made to him, and DeWeaver replied they had not.

The state trial court found that when DeWeaver asked to be taken back to jail in the beginning of the interrogation, the request was not "indicative of a desire not talk." As to voluntariness, the court found that there was no indication that police had attempted to browbeat DeWeaver or otherwise coerce him to make a statement. It determined that DeWeaver's statements that he had been brainwashed, he lacked the necessary decision-making skills, and his will had been overborne were not reflective of what had actually happened. The court emphasized that, during the taped statement, he chose not to name the others involved, he corrected the interrogating officers, and he denied being threatened or promised anything. The trial court concluded that DeWeaver's statement was voluntary.

On direct appeal, DeWeaver challenged the trial-court decision, arguing, among other things, that his request to go back to jail was an invocation of the right to silence. The state appellate court concluded that asking to go back to jail was not an invocation; therefore, DeWeaver's *Miranda* rights were not violated. It also determined that DeWeaver gave the statement voluntarily, noting that because the trial court reasonably credited Joyner's testimony over DeWeaver's, there was no evidence of coercion other than the fact that it was a custodial interrogation. Relying on *Miranda*, the court held that because DeWeaver was given *Miranda* warnings and signed the waiver, any coercive effect inherent in such interrogation was dispelled. *People v. DeWeaver*, No. A091078, 2001 WL 1515830, at *5-7 (Cal. Ct. App. Nov. 28, 2001).

DeWeaver again challenged these conclusions by filing a timely habeas corpus petition with the federal district court; he now appeals the district court's denial of his petition.

## B. Alleged *Miranda* violation

[1] DeWeaver argues that under the Supreme Court's opinion in *Miranda*, asking to go back to the jail was an invocation of his right to remain silent that the police failed to scrupulously honor. In *Miranda*, the Court created procedural safeguards to protect people against the coercive nature of custodial interrogations. 384 U.S. at 467. The *Miranda* Court required police to inform suspects of their right to remain silent, that any statement they make may be used against them, and of their right to the presence of retained or appointed counsel before custodial interrogation. *Id.* at 444. After detailing the requisite warnings and explaining their significance, the *Miranda* Court stated: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74.

[2] In essence, DeWeaver contends that this statement in *Miranda* requires interrogation to immediately cease upon any statement by a suspect that might be interpreted as an invocation of the right to remain silent, even if the statement is ambiguous. The Supreme Court has not yet directly addressed ambiguous statements in the context of the right to remain silent. In the context of another *Miranda* right, the right to the presence of an attorney during interrogation, however, the Court has held that after a valid *Miranda* waiver, an invocation of that right only halts interrogation when it is clear and unambiguous.[1] *Davis v. United States*, 512 U.S. 452, 459-61 (1994).

---

[1] An ambiguous, pre-waiver statement might require different analysis, *see United States v. Rodriguez*, 518 F.3d 1072, 1078-79 (9th Cir. 2008)

The Court recognized that a rule requiring an interrogation to cease based on an ambiguous invocation would become a " 'wholly irrational obstacle[ ] to legitimate police investigative activity' " because such an ambiguous statement would not reasonably inform the interrogating officers that the suspect wanted a lawyer present. *Id.* at 460 (quoting *Michigan v. Mosley*, 423 U.S. 96, 102 (1975)). The Court applied an objective test, requiring a suspect to "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. In focusing on the need for effective law enforcement, the Court noted that this bright line rule protected both the suspect's interests and the valid investigatory tool of proper interrogation. *Id.* at 461.

**[3]** Since the Court's decision in *Davis*, many state and federal courts have extended its rule and required suspects to unambiguously invoke the right to remain silent before police must halt an interrogation. *United States v. Banks*, 78 F.3d 1190, 1197-98 (7th Cir. 1996), *vacated*, *Mills v. United States*, 519 U.S. 990 (1996), *on remand*, 122 F.3d 346, 350-51 (7th Cir. 1997); *Medina v. Singletary*, 59 F.3d 1095, 1100-01 (11th Cir. 1995); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995); *People v. Stitely*, 108 P.3d 182, 196 (Cal.

---

(determining that the *Davis* rule applies only after valid waiver, as a way of reconciling the rule with the "historic presumption against finding waiver of constitutional rights" and distinguishing between invocation and waiver). Although there is some evidence suggesting that DeWeaver requested to go back to jail before waiving his *Miranda* rights, he argues on appeal that the request was made post-waiver and that any other interpretation of the evidence would be unreasonable. By considering whether it was an invocation and not how it affected waiver, the state appellate court treated the request as though it was made after the waiver. Because this is a reasonable interpretation of the evidence, and DeWeaver concedes this point, we consider his request as being made post-waiver. We do not address whether applying the *Davis* rule to such a request made before a valid waiver would be contrary to Supreme Court precedent because the issue is not properly before us.

2005); *State v. Payne*, 199 P.3d 123, 133-34 (Idaho 2008); *State v. Walker*, 118 P.3d 935, 943-44 (Wash. Ct. App. 2005). This court has several times declined to decide whether the *Davis* requirement of a clear and unequivocal invocation applies to the right to remain silent. *See United States v. Rodriguez*, 518 F.3d 1072, 1078 n.5 (9th Cir. 2008) (avoiding addressing the issue and noting that this court had so demurred in four prior cases). We similarly decline to do so here. The question before us is not whether the *Davis* rule applies to an invocation of the right to remain silent, but whether the state appellate court contravened Supreme Court precedent by applying it in that manner. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

**[4]** In similar circumstances, the First Circuit, which has also withheld judgment regarding the application of *Davis* to the invocation of the right to remain silent, held that it could not "deem unreasonable a conclusion by the [state] courts . . . that [was] consistent with the approach taken by so many respected tribunals.' " *James v. Marshall*, 322 F.3d 103, 108 (1st Cir. 2003) (quoting *Bui v. DiPaolo*, 170 F.3d 232, 239 (1st Cir. 1999)). We, likewise, could not conclude that application of the *Davis* rule to an invocation of the right to remain silent is contrary to or an unreasonable application of Supreme Court precedent where the Supreme Court has neither "squarely addresse[d]" when an ambiguous statement amounts to an invocation of the right to remain silent nor refused to extend the *Davis* rule to an invocation of the right to remain silent. *Wright v. Van Patten*, 128 S.Ct. 743, 746 (2008).

**[5]** In this case, although the state appellate court never expressly applied *Davis*'s objective inquiry in analyzing DeWeaver's request to return to jail, its reasoning and result are not contrary to Supreme Court precedent.[2] *See Early v.*

---

[2]The state appellate court based its ruling on three cases: *Delap v. Dugger*, 890 F.2d 285, 293 (11th Cir. 1989), in which the court held, pre-

*Packer*, 537 U.S. 3, 8 (2002) (noting that a state-court decision is not contrary to Supreme Court precedent for failure to cite such decisions, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]"). The state appellate court concluded that asking to be taken back to jail "did not evidence a refusal to talk further." *People v. DeWeaver*, No. A091078, 2001 WL 1515830, at \*5 (Cal. Ct. App. Nov. 28, 2001). In so doing, it considered that DeWeaver said nothing about ending the interrogation or not wanting to talk, that the officers interrogating DeWeaver knew that he knew how to invoke his right to silence because he had done so a few days earlier, and Sergeant Joyner's testimony that he did not understand DeWeaver's request to be an invocation.[3] *Id.* The state appellate court could properly conclude from these facts that a reasonable officer in the circumstances would not have understood DeWeaver's request to be an invocation of the right to silence. *See Davis*, 512 U.S. at 459.

---

*Davis*, that a suspect did not invoke (equivocally or otherwise) his right to remain silent where he asked when he would be allowed to go home; *United States v. Clark*, 67 F.3d 1154, 1163 (5th Cir. 1995), *vacated on other grounds*, *Coffman v. United States*, 519 U.S. 802 (1996), in which the court cursorily stated that questioning that continued after a suspect asked to go home but then consented to further questioning was not coercive or improper and, even if it was, admission of the statement had been harmless; and *Mueller v. Angelone*, 181 F.3d 557, 574 (4th Cir. 1999), in which the court held that a suspect had not clearly invoked his right to counsel under *Davis* when he asked the interrogating officer if the officer thought he needed an attorney.

[3]The state appellate court noted that DeWeaver continued to speak with Joyner after making the request to go back to jail, *DeWeaver*, 2001 WL 1515830, at \*5, but we do not consider DeWeaver's post-request responses to further interrogation in determining whether DeWeaver's request was ambiguous. *See Smith v. Illinois*, 469 U.S. 91, 100 (1984) ("[A]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."). Given our conclusion that his request was ambiguous, any error in the state appellate court's consideration of his subsequent statements was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

**[6]** Thus, the state appellate court's reasoning and result are in accord with *Davis* and a reasonable extension of that rule to the right to remain silent. In such a case, AEDPA requires us to let stand the state court's ruling that no *Miranda* violation required suppression of DeWeaver's statement. *See Early*, 537 U.S. at 8; 28 U.S.C. § 2254(d).

## C. Voluntariness

**[7]** A confession must be suppressed, even absent a *Miranda* violation, when the totality of the circumstances demonstrates that the confession was involuntary. *Dickerson v. United States*, 530 U.S. 428, 434 (2000). However, if interrogators obtained a confession after *Miranda* warnings and a valid waiver, the confession was likely voluntary. *See Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility."); *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare").

**[8]** In his petition, DeWeaver makes no argument that the *Miranda* warnings given were insufficient or that his waiver was involuntary. Instead he relies on his account of a coercive interrogation and vague allegations that his "will was overborne." The state courts discredited DeWeaver's version of the interrogation as coercive, noting DeWeaver's own statement that Joyner made no threats or promises. *People v. DeWeaver*, No. A091078, 2001 WL 1515830, at *6-7 (Cal. Ct. App. Nov. 28, 2001). Believing Joyner's account of the interrogation, the court noted that the remaining vague allegations of coercive techniques consisted only of the coercion inherent in a custodial interrogation, which is dispelled by sufficient *Miranda* warnings and waiver. *Id.* Because warnings were given, a valid waiver obtained, and the record gives no indication that his confession was other than a product of

his free will, we conclude that the state appellate court's decision was not contrary to Supreme Court precedent or an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

### III.   The "chocolate cake caper"

DeWeaver next challenges the trial judge's interactions with the jury during deliberations, culminating in his "chocolate cake caper" jury instruction. The instruction was an illustrative hypothetical about his niece, Amy, stealing a piece of chocolate cake. DeWeaver argues that the state appellate court made an unreasonable factual determination when it found no indication of coercion and decided contrary to Supreme Court precedent in holding that the interactions were not coercive. We address each argument in turn.

### A.   Factual and procedural background

When deliberations began, the jury requested that the trial judge clarify the definitions of "unambiguous" and "conscious disregard for human life," and inquired, "What are [the] options if we are [at] an impasse? We have a juror who is not cooperating." Before receiving a response, the foreperson sent another note: "I am requesting an immediate audience with the judge, as one juror's conduct is hindering the progress of this panel . . . ."

The judge granted the foreperson an audience during which the foreperson revealed that one juror was not open to the suggestions of the other jurors and was making what the foreperson considered to be snappy retorts and insulting comments. The judge then re-instructed the entire jury regarding the definition of "conscious disregard." He also admonished the jury:

>     The People and the defendant are entitled to the individual opinion of each juror. Each of you must

consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself but should do so only after discussing the evidence and the instructions with the other jurors.

Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors or any of them favor that decision . . . .

Remember that you are not partisans or advocates in the matter. You are impartial judges of the facts. The integrity of a trial requires jurors at all times during they're [sic] deliberations to conduct themselves as required by these instructions.

Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the court of the situation.

The jury returned to deliberate further.

The next day, the foreperson asked if the judge would provide a further definition of "jury deliberation" to help convince the juror to deliberate. The judge asked the foreperson to explain what about the juror's behavior indicated to the foreperson that he was refusing to deliberate. The foreperson described the juror as ignoring the conversation in the rest of the jury and refusing to explain his positions, with which the other jurors disagreed, using specific facts. The foreperson noted that the one juror appeared to disagree with the other jurors' interpretations of the instructions. When asked, the foreperson was clear that the juror was not basing his opinion on an agenda or personal philosophy.

Because the disagreement seemed to center on the interpretation of certain instructions, the judge asked the foreperson to return to the jury and create a list of terms on which it needed clarification. After the foreperson returned to the deliberation room to create the list, DeWeaver objected to the court giving further definitions of terms, calling them "more items to hit [the holdout juror] over the head with." The government argued that the holdout juror should be removed for refusing to deliberate. The court said it would not refuse to define terms for the jury and would take a "wait and see" approach to determining if the holdout juror was refusing to deliberate.

Over the weekend, the court received another note from the foreperson and a note from the holdout juror. The foreperson's note asked the court to define "deliberate," "premeditation," "reasonable doubt," "circumstantial evidence," "intent," and "intentional." It also noted that "some jurors are ready to walk if progress does not occur regardless of the consequences." The holdout juror's note denied the foreperson's allegation that the juror was being belligerent or failing to deliberate and stated that other jurors had conducted themselves contrary to the court's instructions. As a separate issue, the court had to replace a juror who had been in a car accident with an alternate.

The court instructed the jury that because an alternate had replaced a juror, it had to start over with its deliberations. The court suggested that the jury consider choosing a new foreperson (while emphasizing that it was not a comment on the current leadership) and asked the jury to reconsider the list of terms it needed defined. At that time the court also discussed the "jurors walking" comment:

> That type of [ ] planning obviously is rather sharp, it's rather confrontational, and it sets a tone that obviously gives concern to all of us. It is important that everybody deliberate with an open mind. It's

also imperative that you keep in mind that you are not advocates, you are not partisans, you are judges of the facts, and with that approach and with that in mind and with all the other instructions that I've given you, when — you know, these are difficult issues, we understand that and we appreciate that. And sometimes one's patience grows short and sometime personalities can get involved in the deliberations and take greater precedent over the issues that are — everybody's there to deal with.

The court adjourned the jury but asked the holdout juror to remain.

The holdout juror accused the other jurors of considering improper bases like DeWeaver's co-defendant's conviction, personal knowledge of the crime scene, and the potential penalty. He further stated that the other jurors had commented that the defense had failed to prove its case. The holdout juror stated that he had told the rest of the jurors that what they were doing was improper and for the most part it stopped. The court then asked the juror to return to the jury and send down the foreperson. The foreperson confirmed that some impermissible bases had come up in the conversation, but that once he had noted the improprieties the jury had moved on without further considering such improper bases. At the end of his discussion with the foreperson, the court explained that it would define the requested terms for a jury in a presentation the next day.

In defining the terms, the court used an expanded version of the "chocolate cake caper" hypothetical to illustrate the terms. The story, which fills 20-pages of transcript, was well summarized by the state appellate court:

In [the] original version, the court had recounted the story of a dinner at which his young niece Amy repeatedly insisted on having some chocolate cake

right away but was told by her mother she would have to wait until after dinner. When the mother subsequently went into the kitchen to check on dinner, she discovered a chair had been pulled from the kitchen table to the counter where the cake was and that there was an irregular hole in the cake. The court discussed these facts, as well as cake crumbs and frosting found on Amy's face, as circumstantial evidence that she had taken and eaten some of the cake. The court also explained that if the mother saw Amy standing on the chair, eating the cake, her testimony about her observations would be direct evidence. Addressing intent, the court explained that intent could be determined by statements made at or near the time of the incident and the circumstances surrounding the act. Returning to Amy, the court noted her intent could be inferred from her statement that she "wanted cake and wanted it now," from the chair having been moved, and from a child-sized gouge in the cake.

During deliberations, the court presented an expanded version of this hypothetical. Again the court explained how Amy's intent could be inferred from statements and circumstances surrounding the act. The court hypothesized that the cake theft required premeditation and deliberation, which, it observed, were shown by Amy's statement that she wanted the cake now and by her having moved and climbed on a chair to reach it. The court similarly related its hypothetical to the reasonableness of two possible explanations for the cake on Amy's face and hands. Suppose, the court hypothesized, Amy said she had moved the chair and climbed up to simply look at the cake, and then lost her balance and fell on the cake. Relating the child's explanation to the [form] instruction (CALJIC 2.02) involving two reasonable interpretations of circumstantial evi-

dence, the court stated that Amy's interpretation was unreasonable in light of the evidence: Amy's earlier demand for cake, the hole gouged in it, the cake on her face and hands, and that she was chewing when discovered.

Turning to the jury's request for clarification of "unambiguous intent" in the context of attempted murder, the court defined unambiguous as "clear, definite, susceptible of but one meaning, to unequivocally show an intent to kill." Again referring to the Amy story, the court added to the hypothetical that Amy (1) enlisted her little sister to help "get some cake"; and (2) was caught red-handed just as she started to grab it. The court stated: "[Y]ou look at her conduct, you can consider her statements before or at the time of the act itself. That shows her intent. You look at the means that are utilized, the manner in which the act is done, and the totality of the circumstance[s]. That shows a clear intent to do the one thing that logically makes sense. [¶] I mean, one could say, well, maybe she was just trying to see how close her finger could get. That doesn't make sense."

*People v. DeWeaver*, No. A091078, 2001 WL 1515830, at *8 (Cal. Ct. App. Nov. 28, 2001).

After giving this expanded illustration, the trial judge admonished the jury to consider his story in the light of the other instructions and reminded the jurors of their duties. Specifically, he said:

Please do not construe my explanation to be a comment by me on the evidence or a suggestion on what you should find to be the facts. Please remember that you are the exclusive judges of the facts and you

> may disregard any or all of my comments if they do
> not coincide with your views of the evidence.

Finally the judge reminded the jury: "Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors or any of them favor that decision." Without further interaction with the judge, the jury returned its guilty verdict later that day.

On direct appeal, the state appellate court determined: "[T]he record of the court's inquiries into the questions and problems reported by the jurors reveals a prudent, reasonable and balanced course of action. We search the record in vain for any indication of coercion, express or implicit . . . ." *DeWeaver*, 2001 WL 1515830, at *9 n.7. However, because the hypothetical presented only situations in which Amy was guilty, the court concluded that it had a prosecutorial slant. *Id.* at *10. In deciding that any such error was harmless, it considered whether the instruction denied DeWeaver a fair trial. *Id.* The appellate court emphasized that the jury instruction correctly stated the law, the trial judge advised the jury not to use the instruction as a comment on the evidence, the facts of the hypothetical were very different from the facts of the shootings, the timing of the verdict did not indicate it was induced, and guilt or innocence was not a close factual issue. *Id.* at *10-11.

## B. The state court's factual determinations

DeWeaver argues that the state court ignored material evidence in determining that the record contained no indication of coercion. He argues that, as a result, the state court's factfinding process was defective and its decision based on an unreasonable determination of the facts. In *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2001), on which DeWeaver relies, this court cautioned that "before we can determine that the state-court fact-finding process is defective in some mate-

rial way . . . , we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the . . . fact-finding process was adequate." In *Taylor*, this court determined that no reasonable appellate tribunal would ignore the testimony of a witness that corroborated the petitioner's version of challenged events. Because the state court had blatantly ignored such probative evidence, this court set aside its findings as unreasonable. *Id.* at 1005-07.

In contrast, DeWeaver disagrees with the state court's interpretation of the record but does not point to any material fact that the court failed to consider. The state appellate court accurately recounted the trial court's interactions with the jury; nothing in the record indicates that its fact-finding process was unreasonable. Insofar as DeWeaver argues that the state appellate court failed to properly weigh the evidence, we consider this further in analyzing whether the court's legal conclusion regarding coerciveness was contrary to or an unreasonable application of Supreme Court precedent.

## C. Alleged coerciveness of the instruction

**[9]** DeWeaver argues that the "chocolate cake caper" instruction was so coercive that it constituted directing a verdict. "Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). Thus, an instruction is unconstitutionally coercive if it denies a defendant the due process right to a trial by a fair and impartial jury. *See id.* That right is not violated when the judge gives a so-called *Allen* charge, named for *Allen v. United States*, 164 U.S. 492, 501-02 (1896), which encourages a dissenting juror to give weight to the views of the majority. To determine whether an instruction is coercive, the Court "consider[s] the supplemental charge given by the trial court in its context and under all the circumstances.' " *Lowenfield*, 484 U.S. at 237 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)).

In a case similar to this one, *Early v. Packer*, 537 U.S. 3 (2002), the Supreme Court reversed a grant of habeas, determining that the California court had reasonably concluded an instruction was not coercive. In that case, the jury deliberated for 28 hours before one juror asked to be removed from the jury. The foreperson accused that juror of failing to deliberate in a note that said, "nearly all my fellow jurors questio[n] her ability to understand the rules and her ability to reason." *Id.* at 4. The court read that note aloud to the entire jury, instructed it that the one juror had the right to disagree with the rest of the jurors, inquired as to the latest vote count, and admonished the jury to consider the law as instructed and the facts as they found them. The next day, the one juror again asked to be removed, but the court insisted she continue trying to deliberate. The jury returned a guilty verdict after two more days of deliberation. *Id.* at 4-6. The Supreme Court upheld the state appellate court's determination that no coercion had occurred, concluding that it was neither contrary to nor an unreasonable application of Supreme Court precedent. *Id.* at 11.

In many ways, the facts of this case are not sufficiently distinguishable from those in *Early* to warrant a different result. Although DeWeaver argues that the state court ignored how the trial court singled out the holdout juror and inquired into the deliberative process, the trial court in this case did no more in that regard than the court in *Early*. The only distinction between the two cases is the forty-five minute "chocolate cake caper" instruction, which the state appellate court concluded was prosecutorially slanted because it only presented hypothetical situations in which the suspect was guilty.[4] The

---

[4]DeWeaver also argues that the state court improperly applied harmless error analysis to this instruction, alleging that the error was structural. DeWeaver does not argue that a prosecutorial slant alone is structural error but that a coercive jury instruction would be structural error. Because we conclude that the state court reasonably determined that the instruction was not coercive, we do not reach the question of whether a coercive instruction would be structural error.

state appellate court considered the instruction an attempt to respond to the jury's concerns and questions about the law, lauding its goal of explaining the law in an understandable manner while warning that such explanations must be evenly balanced. The court concluded that the instruction properly stated the law and, most importantly, that it did not deprive DeWeaver of his right to a fair trial. *DeWeaver*, 2001 WL 1515830, at *9-11.

[10] Although the state court performed its fair-trial analysis in the context of harmless error, its analysis was consistent with *Lowenfield*, in which the Court describes an unconstitutionally coercive jury instruction as one that deprives a defendant of due process. 484 U.S. at 241. The state appellate court properly considered the totality of the circumstances surrounding the trial judge's interactions with the jury, emphasizing that the trial judge correctly instructed the jury on the law, advised the jury not to use the instruction as a comment on the evidence, and employed hypothetical facts very different from the facts of the shootings. *DeWeaver*, 2001 WL 1515830, at *10. Neither the court's reasoning nor result were contrary to Supreme Court precedent; therefore, we must let the state court's decision stand. *See Early*, 537 U.S. at 8.

## IV. Conclusion

In conclusion, DeWeaver fails to demonstrate any way in which the state-court decision unreasonably applied or was contrary to Supreme Court precedent. Nor does he establish that the state court decision was based on an unreasonable factual determination. The state court reasonably concluded that *Miranda* was not violated and that DeWeaver's confession was voluntary. Its decision regarding the allegedly coercive jury instruction was not based on an unreasonable determination of the facts, nor were its conclusions concerning coercion contrary to Supreme Court precedent. Therefore, we affirm the district court's denial of the habeas petition.

**AFFIRMED.**