Filed 6/24/15  P. v. Flores CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESUS REYNOSO FLORES et al.,<br><br>    Defendants and Appellants. | F067554<br><br>(Super. Ct. Nos. MCR031666A & B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  James E. Oakley, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Reynoso Flores.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant Jose Antonio Flores-Ventura.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Codefendants Jesus Reynoso Flores and Jose Antonio Flores-Ventura were convicted of the murder of Alberto Ivan Narvaez-Torres and the attempted murder of Sergio Ventura. Flores contends the trial court erred in denying his motion to suppress his confession because he alleges the police violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) by continuing the interrogation when Flores asked to go back to his cell. Flores-Ventura contends the trial court erred in its jury instruction regarding his mental state for attempted murder. Both defendants contend the trial court erred in failing to make them jointly and severally liable for direct victim restitution. We reject these contentions. Defendants further contend, and the People concede, that they are entitled to one additional day of presentence custody credit.

# PROCEDURAL BACKGROUND

On March 21, 2013, just after the commencement of trial, the court ordered each defendant to be tried by separate juries. Separate juries were empaneled in each defendant's case. On April 23, 2013, the juries reached their verdicts.

The Flores jury found him guilty in count 1 of first degree murder of Narvaez-Torres (Pen. Code,[1] § 187, subd. (a)) and found true the special circumstance allegations that Flores was lying in wait during the murder (§ 190.2, subd. (a)(15)) and he was engaged in robbery during the murder (§ 190.2, subd. (a)(17)). The jury found true allegations that Flores personally used a gun in the murder pursuant to section 12022.53, subdivisions (b), (c), and (d).

Flores was found guilty in count 2 of the attempted murder of Sergio Ventura (§§ 664, subd. (a), 187, subd. (a)). The jury found true allegations that Flores personally used a gun in count 2 pursuant to section 12022.53, subdivisions (b) and (c). The jury found allegations that Flores personally used a gun in the attempted murder pursuant to

---

[1]Unless otherwise designated, statutory designations are to the Penal Code.

section 12022.53, subdivision (d), and that Flores caused great bodily injury within the meaning of section 12022.7, subdivision (a), to be not true.

The Flores-Ventura jury found him guilty in count 1 of first degree murder of Narvaez-Torres and found true the robbery-murder special circumstance that Flores-Ventura committed count 1 during a robbery. Flores-Ventura was found guilty of the attempted first degree murder of Sergio Ventura. The jury found allegations in both counts that Flores-Ventura personally used a firearm within the meaning of section 12022.53, subdivision (b) to be not true.[2]

Defendants were sentenced on June 21, 2013. The trial court sentenced Flores to a prison term of life without the possibility of parole on count 1 plus a term of 25 years to life for the section 12022.53, subdivision (d) enhancement. Flores was sentenced to a consecutive term on count 2 of life with the possibility of parole plus a term of 20 years for the section 12022.53, subdivision (c) enhancement. Flores received custody credits of 1,880 days and was ordered to pay direct victim restitution of $9,074.88.

The trial court sentenced Flores-Ventura to a prison term of life without the possibility of parole on count 1 and to a consecutive term of life with the possibility of parole on count 2. The court granted Flores-Ventura 1,880 days of custody credits and imposed direct victim restitution of $9,074.88. The trial court did not make either defendant jointly and severally liable for the direct victim restitution award.

---

[2]The trial court had earlier granted the People's motion to dismiss allegations that Flores-Ventura had been lying in wait during the murder and had caused great bodily injury to Sergio Ventura during the attempted murder. The clerk's transcript of the sentencing hearing refers to two special circumstances, robbery and lying in wait, as justifying a sentence for Flores-Ventura of life without the possibility of parole. Only the robbery special circumstance is applicable to Flores-Ventura and the reference to a lying-in-wait special circumstance for Flores-Ventura is clerical error.

**FACTS**

*Dairy Shootings*

On January 19, 2008, Sergio Ventura, Salvador Gutierrez Martinez, and Alberto Ivan Narvaez-Torres, were working the late nightshift at the Coelho Farms dairy in Chowchilla. It was Narvaez-Torres's first night on the job.

As the three men worked in the milking barn, two men rushed in and one of them initially fired two gunshots. The shooter was wearing a multicolored sweater and a yellow bandana. The shooter used a rifle with a piece of cloth tied on to catch the shell casings as they were ejected from the gun. The second assailant carried a shotgun but did not fire any shots.

Ventura explained that Narvaez-Torres was shot and dropped to the ground. A bullet grazed Ventura in the head. Ventura initially tried to run away, saw someone else had entered the barn, and realized he could not escape. Ventura dropped to the ground and played dead. Narvaez-Torres was making noises until the shooter shot him again.

Right after Narvaez-Torres stopped making any sounds, Ventura could feel the assailants searching his pants pockets. Referring to Ventura, one of the assailants said to the other that "[t]his dude, he doesn't have anything." When Martinez, the third dairy worker, saw a gun and heard gunshots, he ran out of the barn, got a tractor, and went to Tim Coelho's home.

Coelho's home is about a quarter of a mile from the dairy barn. When Martinez and Coelho returned to the barn, they found Narvaez-Torres not breathing, with a pool of blood behind his head. A spent bullet was found in the barn. During the autopsy of Narvaez-Torres, one bullet was recovered from the victim's brain and another was recovered from his vertebrae. The bullets recovered from Narvaez-Torres were .22-caliber.

Ventura explained that Flores-Ventura was his cousin and was familiar to him. Flores-Ventura had previously worked at the dairy, but stopped doing so months prior to the shooting. Ventura saw the assailants at trial and identified Flores-Ventura. Ventura

4.

viewed a video of the shooting and testified that it accurately depicted the events that occurred that night.

According to Coelho, Flores-Ventura had worked at the dairy until August 2007. Coelho fired Flores-Ventura because he was tardy to work and failed to show up to work a couple of times.

Soon after the shooting, Flores told his friend Miguel Guillen that he had gone with Flores-Ventura to the dairy in Flores's car. They went to the dairy because someone owed Flores-Ventura money. Flores told Guillen he shot the guy who was killed with a .22-caliber rifle. When Guillen asked Flores why he did it, Flores said "he had to." Flores also told Guillen they got $10 from the victims and he later buried or burned the rifle.

### Flores's Conversations with Confidential Informant

Sergeant Jason Clark of the Madera County Sheriff's Department was the lead detective in the murder investigation. Clark was introduced by a narcotics investigator to a confidential informant known as Chino on April 18, 2008. Chino agreed to use a digital recorder and subsequently met with Flores on April 18 to record their conversation. An attempt to record a conversation between Chino and Flores on April 19 failed. A second recording was made on April 21 and a third recording was made on April 24. All three recordings were transcribed.

On April 18, Flores admitted he did the "job" at the dairy. When Chino told Flores he did not believe Flores did it, Flores replied that hardly anyone knew. Flores told Chino he was angry at a guy who owed him money. Flores said to Chino that the guy he killed at the dairy, "it was not his problem." Flores referred to the gun being a sawed-off .22 rifle and that it was burned. Flores said he burned the distinctive sweater he was wearing during the shooting. The remaining clothes Flores wore that day were either burned or thrown away. Flores said he had a sock attached to the rifle with a rubber band to catch the ejected shells.

5.

Flores-Ventura's residence was searched on April 28, 2008. In one of the bedrooms, investigators found a shotgun and shotgun ammunition on the floor next to the bed. Flores's residence was also searched on the same day. A bag of .22-caliber ammunition was found in a white pickup truck parked next to the residence. Investigators found a revolver in the glove compartment of another truck at the residence and a shotgun was found underneath the sofa cushions inside the residence.

*Custodial Interrogation of Flores-Ventura*

Flores-Ventura was taken into custody and questioned by Sergeant Clark and Detective Zachary Zamudio at the Chowchilla Police Department. Flores-Ventura was given his *Miranda* rights, which he waived. The interrogation was recorded, played for the jury, and also transcribed.

Flores-Ventura initially denied any involvement with the shootings at the dairy. Flores-Ventura then admitted he went to the dairy with Flores. Flores-Ventura told the investigators he had a shotgun and Flores was armed with a .22 rifle . They drove to the dairy, parked by some trees, and waited in some bushes for five to 15 minutes, or as long as 20 minutes. Flores asked Flores-Ventura if he "'[s]hould … take all of them out?'" Flores-Ventura said, "No dude, don't take nobody out." When they went into the barn, Flores asked Flores-Ventura whether he "'[s]hould … do it.'" Flores-Ventura said he did not know and it was up to Flores. Flores then shot the victims. As one of the victims was whining, Flores shot him again. When Flores-Ventura saw that one of the men who had been shot was his cousin, he wanted to get out of there. Flores-Ventura said Flores turned the dead victim over and took some money. Flores-Ventura said they brought guns just to scare the victims. According to Flores-Ventura, everyone in Chowchilla knew Flores was one of the assailants because of the distinctive sweater he wore.

*Custodial Interrogation of Flores*

Flores was interrogated in an interview room in the Madera County Department of Corrections Classifications Unit on April 28 by Sergeant Zamudio and Detective Clark.

The audio recording of the interrogation was played for the jury at trial and a transcription is included in the record.

Clark read Flores his rights pursuant to *Miranda* off of a department issued card. Flores acknowledged he understood each right, waived them, and talked to the investigators. Early during questioning, Zamudio and Clark told Flores they knew he perpetrated the crime and they had proof he did it. Flores denied the allegation. Flores denied having a rifle and said he only had a shotgun.

The investigators told Flores he was probably thinking he would have a short stay in jail and get out, but they assured Flores this would not happen. The investigators told Flores they knew he went to the dairy with another person, they knew the car he drove, and they knew exactly what had happened. Further, the investigators asserted Flores knew where the rifle was located, that he had not gotten rid of it and they needed to get it before it hurt someone else. Flores replied he did not know where the rifle was located and again claimed he only had a shotgun. When the investigators insisted to Flores everything they were telling him was true, Flores replied, "It's just bullshit." The investigators told Flores to start over and to tell the truth but Flores replied, "I'm done talking."

Flores was told that when they walked out of the interrogation room, he was going to be charged with murder, attempted murder, and conspiracy. Flores was asked if he had intended to kill anyone and to explain what had been going on in his head. The investigators assured Flores they were not "bullshitt[ing]" him. When Flores was told the investigators had already talked to his partner and they were now going to explain to him how the crime occurred, Flores said he did not want to hear about it.

The investigators asked Flores whether it was hard for him to sleep at night or if he was just a cold-blooded killer. They told Flores they were not going to go away. The investigators told Flores they had found someone who had seen the rifle. They told Flores they found live .22 rounds and had a recording of Flores talking about committing

7.

the crimes. The investigators also told Flores they had seen his car and taken fingerprints from it.

The investigators asked Flores if he had gone to the dairy to kill three people. They told Flores the story was one-sided but he could answer their questions. Flores replied, "I just want to go back to my cell." When the officers asked if this was what he wanted, Flores replied, "Yeah." The investigators told Flores he would go back to his cell shortly and then asked him if he was tired of hearing the truth. The investigators suggested the image of the murder victim must be tearing Flores up, asked him how he felt when he saw the victim's "life go out," and to consider what his mother would want him to do.

The questioning continued for another two hours. The investigators suggested they would have to tell Flores's mother that he was a cold-blooded murderer. Flores denied that he was. When Flores was again asked how much of a cold-blooded murderer he was, he replied, "It just happened."

As the investigators confronted Flores with the details of the crimes, he said he wanted to go home. When the investigators suggested he would feel a lot better after talking to them, Flores replied, "Yeah, but then [it's] gonna look bad on me. [¶] … [¶] I don't want to do time."

Flores continued to insist he did not know where the rifle was located. When Flores was asked if someone was supposed to be killed at the dairy, he replied, "No." Flores then said that it was Flores-Ventura's idea to drive out to the dairy that night to get money from someone who worked there. Flores did not know how much money was owed to Flores-Ventura or whether the guy was at the dairy. Flores said the crimes "just happened" and they did not want to get "caught up or something." Flores would not blame Flores-Ventura and said the events were no one's fault. Flores said they did not know where the other dairy worker went and they panicked.

The investigators asked Flores if he needed a break or something to drink. Flores replied, "No. I wanna just go relax." Flores told the investigators he knew they were

going to hold him, and he was told his bail would be high. Flores said he was hungry and wanted to go. When asked if he was sure, he said "[y]eah," but then asserted he was not a criminal and continued answering questions.

Flores told the investigators the person he and Flores-Ventura had been looking for was not at the dairy, they got scared and "freaked out," and he killed the victim by accident. Flores admitted he shot both men that night. Flores admitted that when the victim was yelling, Flores shot him in the head. Flores admitted that he "did the sweater." Flores later said he wanted to go, but then continued to insist he did not know where the rifle was located.

Flores was asked if he wanted to continue talking. He replied twice that he was "cool," wanted to eat, and was cold. Investigators offered to bring Flores food and a blanket or a sweater. Flores immediately received a sweater.

Flores said he and Flores-Ventura waited across the street 15 or 30 minutes to see who was coming and going before they walked to the barn. Flores had the rifle and Flores-Ventura carried the shotgun. Flores shot both victims. They threw their clothes in a dumpster. Flores said he did not intend to shoot anyone, he only wanted to scare them. The investigators asked Flores if he wanted water. He replied he just wanted to relax. Flores then explained the rifle was destroyed, cut into pieces and thrown into different spots, and a child would not find it.

### Hearing on Flores's Motion to Exclude His Confession

The court conducted a hearing pursuant to Evidence Code section 402 on Flores's motion to exclude his confession for violating *Miranda*. Outside the presence of the jury, Sergeant Zamudio listened to the recording of Flores's interrogation while following a written transcript of the recording. Zamudio stated the transcript accurately depicted the interrogation. The examination room was about 12 feet by 10 feet and had a table. Flores was not handcuffed during questioning.

During questioning, Flores said he wanted to go back to his cell and later mentioned wanting to go home. Zamudio believed Flores did not want to end

9.

questioning altogether, but felt the questions were hitting close to home and Flores did not want to respond to them. When Flores said he wanted to go home, Zamudio told him that was not an option and continued talking to him.

Zamudio understood that when a defendant states he or she wants to remain silent, his questioning of the defendant has to end. Flores, however, did not say he wanted to remain silent. Zamudio would have stopped questioning had Flores said he wanted to remain silent. After a long period of silence, Flores had said he wanted to go back to the cell.

Zamudio viewed Flores's comment about being "done talking" as a similar attempt to avoid the particular questions he was being asked. Sergeant Clark also testified he did not believe Flores's statements were an invocation of his right to remain silent based on his demeanor and the circumstances surrounding the statement. Zamudio and Clark both observed that during most of the questioning, Flores looked down at the ground. Flores was not falling asleep. Clark described Flores as looking defeated and overwhelmed during the interrogation.

The prosecutor argued that Flores had received and waived his *Miranda* rights and failed to make a clear, unequivocal invocation of the right to remain silent. Flores's counsel argued that his client's request to go back to his jail cell was the functional equivalent of asserting his right to remain silent. The trial court found Flores failed to make an unequivocal and unambiguous invocation of his right to remain silent. The court noted questioning continued and Flores continued to answer questions rather than refusing to do so or asking for questioning to stop. The court found Flores's statements to be voluntary and denied his motion to exclude them.

## DISCUSSION

### 1.      Alleged *Miranda* Error

Flores contends he made an unequivocal and unambiguous assertion of his right to silence when he asked to go back to his jail cell. Flores argues the investigating officers violated his *Miranda* rights and the trial court erred in failing to exclude the statements he

made during his interrogation after making that request.  Flores-Ventura, who filed his opening brief prior to Flores, joined in Flores's arguments pursuant to California Rules of Court, rule 8.200(a)(5).

After the adoption in 1982 of former article I, section 28, subdivision (d) of the California Constitution, California's appellate courts must apply federal standards to *Miranda* issues.  The reviewing court must accept the trial court's resolution of disputed facts and the inferences that can be drawn from those facts, as well as the trial court's evaluations of credibility, if supported by substantial evidence.  The reviewing court "'independently determine[s] from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.'"  (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)

A suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the rights to remain silent and the presence of counsel, and the right to appointed counsel if indigent.  (*People v. Dykes* (2009) 46 Cal.4th 731, 751.)  After being advised of his or her rights, a suspect can validly waive them and respond to questioning.  (*Edwards v. Arizona* (1981) 451 U.S. 477, 484.)

If the suspect indicates at any time prior to or during questioning that he or she wishes to remain silent or wants an attorney, the interrogation must cease until an attorney is present.  (*Miranda*, *supra*, 384 U.S. at pp. 473-474.)  "'The prosecution bears the burden of demonstrating the validity of the defendant's waiver [of *Miranda* rights] by a preponderance of the evidence.'"  (*People v. Williams* (2010) 49 Cal.4th 405, 425; see *People v. Dykes*, *supra*, 46 Cal.4th at p. 751.)

Where, as here, the defendant initially waives *Miranda* rights and then requests counsel or seeks to end the interrogation, the United States Supreme Court has set forth the standard for courts to determine whether questioning should cease in *Davis v. United States* (1994) 512 U.S. 452 (*Davis*).  The defendant in *Davis* was being interrogated by agents of the Naval Investigative Service after being advised of and waiving his *Miranda* rights.  About an hour and a half into questioning, the defendant said that maybe he

should talk to a lawyer. The agents asked him if he wanted a lawyer and reminded the defendant of his right to remain silent. The defendant said he thought he wanted a lawyer before he said anything else. (*Davis*, *supra*, at p. 455.)

In *Davis*, the Supreme Court found that whether the suspect has invoked his or her right to counsel is an objective inquiry. If the suspect, however, makes a reference to an attorney that is ambiguous or equivocal so that a reasonable officer in light of the circumstances would have understood that the suspect might be invoking the right to counsel, investigators do not have to cease questioning. It is incumbent upon the suspect to unambiguously request counsel. (*Davis*, *supra*, 512 U.S. at pp. 459-460.) The Supreme Court noted that once the suspect has received *Miranda* warnings and there is a knowing and voluntary waiver of them, this is sufficient to dispel any coercion in the interrogation process. (*Davis*, *supra*, 512 U.S. at p. 461.)

Applying the standard for postwaiver invocation of *Miranda* rights set forth in *Davis*, the California Supreme Court evaluated the claim of a juvenile who had been given complete *Miranda* warnings and implicitly waived his rights by answering questions by investigators. (*People v. Nelson* (2012) 53 Cal.4th 367, 375-380 (*Nelson*).) The juvenile sought to suppress statements he made after later telling investigators he wanted to let his mother know where he was and what was happening to him. The juvenile made a request for counsel, but limited it to counsel's presence during a polygraph test. Toward the end of questioning, the juvenile stated several times he wanted to see his mother, he wanted time to be alone until his family arrived, and he wanted time to think about things before writing a statement concerning what happened. (*Id*. at pp. 382-383.)

The court in *Nelson* found that under these circumstances, the juvenile "did not convey an unambiguous request to halt all questioning, or a clear unwillingness to continue … without a lawyer." (*Nelson*, *supra*, 53 Cal.4th at p. 382.) *Nelson* further found that the invocation for counsel was conditional to the application of a polygraph test. (*Ibid*.) It held the juvenile defendant had failed to make an unambiguous and

unequivocal invocation of his *Miranda* rights and "[a] reasonable officer in the circumstances would not have understood defendant's requests to call his mother, or any of his other statements, to be unambiguous and unequivocal invocations of his *Miranda* rights." (*Id.* at p. 383.) The court concluded the investigators were not required to cease questioning, and the defendant's custodial statements were admissible at trial. (*Id.* at pp. 383-384.)

Flores does not challenge the initial advisement of *Miranda* rights, or his waiver of them, prior to questioning by investigators. As did the defendants in *Davis* and *Nelson*, Flores asserts there was a violation of his *Miranda* rights after he waived them and participated in questioning by the investigators. Early during the interrogation, Flores said he was done talking and shortly thereafter asked to be taken back to his jail cell. Much later during questioning, Flores said he wanted to go home. On each of these occasions, however, Flores continued to engage in conversation with investigators, continued to deny he was a cold-blooded killer, and failed to clearly state either that he wanted an attorney or he wanted to stop questioning. When investigators asked Flores late into the interrogation whether he wanted to stop, he replied he was "cool."

Under the circumstances of this case, Flores failed to make an unequivocal and unambiguous assertion that he wanted counsel or that he wanted to stop talking to the investigators. Two cases—one from the California Supreme Court and the other from the Ninth Circuit Court of Appeals—involve nearly identical facts to this case. In both cases the defendant asked to be taken back to his cell, and it was held the statement was not an unequivocal and unambiguous request to end questioning. (*People v. Rundle* (2008) 43 Cal.4th 76, 114-116 (*Rundle*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *DeWeaver v. Runnels* (9th Cir. 2009) 556 F.3d 995, 1001-1002 (*DeWeaver*).)

Flores attempts to distinguish *DeWeaver* by arguing the investigators here did not know Flores knew how to invoke his right to silence. In light of the testimony from both Clark and Zamudio that they did not perceive Flores's comments as an invocation of his

13.

*Miranda* rights, and giving due deference to the factual findings of the trial court, we find Flores's attempt to distinguish *DeWeaver* to be unpersuasive.

This case is also directly analogous to *People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*), where the defendant said he thought it was about time to stop talking. The California Supreme Court held that a reasonable officer would not find such a statement to be an unequivocal and unambiguous request to terminate the interrogation. (*Id*. at p. 536.) We find *Davis*, *Nelson*, *Stitely*, *Rundle*, and *DeWeaver* to be both persuasive and controlling authority. Flores's statements seeking to go back to his jail cell and that he should stop talking were not unequivocal and unambiguous attempts to invoke his *Miranda* rights and to end further interrogation. The trial court did not err in denying Flores's motion to suppress his statements to investigators.

Flores-Ventura's joinder to all of the arguments made in his codefendant's brief that could be potentially beneficial to him was filed two days prior to the filing of Flores's brief and appears to have been made out of an abundance of caution by Flores-Ventura's appellate counsel. Flores-Ventura has not articulated an argument and has not cited authority supporting his joinder of this issue and we therefore reject this claim as improper joinder. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364; *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

## 2. Instruction on Premeditation for Attempted Murder

### A. Introduction

Flores-Ventura contends the trial court improperly instructed the jury on the mental state necessary for premeditation of attempted murder. Because Flores-Ventura's guilt was based on being an accomplice, he argues that legally the jury had to evaluate Flores's intent in the commission of attempted murder, not his own intent. Flores-Ventura notes the attempted murder instruction only referred to "the defendant" and failed to name Flores as the perpetrator. Flores-Ventura contends the lack of specificity created uncertainty in the instructions over whether the jury had to evaluate Flores-

Ventura's mental state or that of Flores, and the error effectively omitted the element of intent from the offense of attempted murder.

The People argue Flores-Ventura failed to object to the instructions given, failed to request any modification to the instructions given, and has forfeited this point for appeal. The People further argue that even if there is error, it is harmless. Because Flores-Ventura contends an element of the offense was missing, we do not discuss forfeiture but review the merits of an appellant's contention. (See *Neder v. United States* (1999) 527 U.S. 1, 15-20.) We find the trial court's instructions were, at most, ambiguous, any ambiguity was resolved by the other properly given instructions as well as the argument of counsel, and the challenged instructions did not leave out an element of intent for attempted murder. We also agree with the People that if any error occurred, it was harmless beyond a reasonable doubt.

### B.     Jury Instructions

Flores-Ventura initially notes the two packets of instructions separately given to each jury were improperly designated. Throughout the trial, Flores was designated as defendant A and Flores-Ventura was designated as defendant B. The Flores and Flores-Ventura juries were also referred to, respectively, as Panel #1 and as Panel #2. The two jury panels were instructed separately, two days apart, and deliberated separately.

The written instruction packet to the jury for defendant A aligned with the court's oral instructions given for Flores-Ventura. The written instruction packet to the jury for defendant B aligned with the court's oral instructions given for Flores. We agree with Flores-Ventura's appellate counsel that the two packets were mislabeled and the written instructions given to the Flores-Ventura jury were those designated in the clerk's transcript as for defendant A.[3]

---

[3]We note the two jury panels were instructed separately, two days apart, and deliberated separately. Prior to instructing each jury, the trial court explained the jurors would have a set of instructions with them in the jury room. The reporter's transcript of the instructions read to the Flores jury by the trial court had extensive explanations of lying in wait and do not include aiding and abetting instructions. At the beginning of the written instructions that conform with the trial court's oral instructions to the Flores jury, however, are the handwritten words:

15.

We turn to the instructions given to the Flores-Ventura jury for attempted murder, as alleged in count 2. The jury received CALCRIM Nos. 600 and 601. Flores-Ventura does not challenge the elements of attempted murder as set forth in these instructions. Flores-Ventura argues that because he is criminally liable on an aiding and abetting theory, it is Flores's intent to kill that should be evaluated by his jury, and the instructions as given created the ambiguity that either defendant's intent could have been weighed by the jury.

Flores-Ventura argues both attempted murder instructions only refer generically to "the defendant" being charged with attempted murder and are, therefore, ambiguous because "defendant" could refer to him rather than to Flores. The elements listed in CALCRIM No. 600 are: "1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." The reference in CALCRIM No. 601 instructs the jury: "The defendant acted willfully if he intended to kill when he acted."

The jury also received aiding and abetting instructions: CALCRIM Nos. 400, 401, and 403. CALCRIM No. 400 explains that a person may be guilty of a crime as a perpetrator, or as an aider and abettor.

CALCRIM No. 401 explains that to prove a defendant guilty of a crime based on aiding and abetting, the People must prove the perpetrator committed the crime, the defendant knew the perpetrator committed the crime, before or during the offense, the defendant intended to aid and abet the perpetrator in committing the crime, and the defendant's words or conduct did aid and abet the perpetrator's commission of the crime. CALCRIM No. 401 further states: "Someone aids and abets a crime if he or she knows

"(GIVEN) DEFENDANT B." The reporter's transcript of the instructions read to the Flores-Ventura jury tracks the instructions in the other written packet, designated with the handwritten words: "(GIVEN) DEFENDANT A," and includes, inter alia, aiding and abetting instructions. The handwritten designations appear to indicate that the A defendant, Flores, received the instructions for the B defendant, Flores-Ventura, and Flores-Ventura received the A instructions meant for Flores. We find it unlikely, however, that either jury received the wrong printed instructions for its deliberations. The error appears to be clerical in nature.

16.

of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

CALCRIM No. 403 explained that prior to determining whether Flores-Ventura was guilty of murder and/or attempted murder, the jury had to determine if he was guilty of robbery or attempted robbery. Before Flores-Ventura could be found guilty of murder or attempted murder, the jury had to evaluate whether a person in his position would have known that murder and/or attempted murder were a natural and probable consequence of robbery or attempted robbery as an aider and abettor. CALCRIM No. 403 further reiterated the jury had to determine whether Flores-Ventura aided and abetted robbery or attempted robbery and that murder and/or attempted murder were a natural and probable consequence of the target offense.

### C.    Analysis

Although the prosecutor also argued the theory of uncharged conspiracy to show Flores-Ventura's liability for attempted murder, the primary theory focused on by both the prosecution and the defense was that Flores-Ventura aided and abetted the perpetrator. To be guilty of attempted murder, a specific intent offense, the aider and abettor must share the specific intent of the direct perpetrator. The aider and abettor must know the full extent of the perpetrator's criminal purpose and must give aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

A person who knowingly aids and abets criminal conduct is not only guilty of the intended target offense, he or she is also guilty of any other crime the perpetrator actually commits that is a natural and probable consequence of the target offense. Criminal liability under the natural and probable consequences doctrine is determined by whether a reasonable person in the defendant's position would, or should, have known the charged offense was a reasonably foreseeable consequence of the offense aided or abetted. A

17.

reasonably foreseeable consequence is a factual issue to be resolved by the trier of fact. (*People v. Favor* (2012) 54 Cal.4th 868, 874.)

In support of his argument, Flores-Ventura cites *People v. Sanchez* (2013) 221 Cal.App.4th 1012 (*Sanchez*). In *Sanchez*, the defendant was convicted as an aider and abettor to first degree murder based on the natural and probable consequences doctrine. (*Id*. at pp. 1014-1015, 1025-1026.) The *Sanchez* case involved the murder of a victim that began with an assault and a kidnapping. There were multiple participants in the crime. The jury had to agree as to which of the two target crimes the defendant acted as a participant. The prosecutor argued the defendant could be convicted of first degree murder if he participated in the kidnapping of the victim but could only be convicted of second degree murder if the defendant only participated in assault. (*Id*. at pp. 1020-1022.) Defense counsel objected to an instruction stating the jury did not have to agree on the same theory supporting natural and probable consequences liability. (*Id*. at pp. 1022-1023.)

The *Sanchez* court found the trial court's failure to give a unanimity instruction on the theory of murder was reversible error because one theory led to culpability for first degree murder and the other led to culpability for second degree murder. (*Sanchez*, *supra*, 221 Cal.App.4th at pp. 1024-1025.) The error in *Sanchez* was compounded because the instructions further stated the jury had to find the defendant acted with malice, not the perpetrator. The *Sanchez* court explained this undermined the prosecutor's theory of the case. (*Id*. at pp. 1025-1026.) In addition, "[d]irecting the jury's attention to a nonexistent requirement that defendant killed with malice may have inadvertently undermined the notion that the killing of [the victim] was murder in the second degree." (*Id.* at p. 1026.)

The *Sanchez* court further noted the trial court's instruction was inconsistent with the prosecution's theory of second degree murder based not on the premise that the defendant killed, but was involved in an assault. The *Sanchez* court determined: "By providing a definition of second degree murder that did not fit the facts, the jury was left

18.

with a choice of first degree murder by default." (*Sanchez*, *supra*, 221 Cal.App.4th at p. 1026.)

In *Sanchez*, the erroneous instruction all but foreclosed the jury's consideration of one of two theories posited by the prosecution. That theory would have mitigated the defendant's culpability from first to second degree murder. Unlike *Sanchez*, the defendant here was culpable on a theory of aiding and abetting the perpetrator. Attempted murder, however, cannot be broken down into degrees. (*People v. Favor*, *supra*, 54 Cal.4th at p. 876.) There was no alternative lesser offense or mitigating alternative offense other than attempted murder. Unlike the jury in *Sanchez*, the Flores-Ventura jury was not foreclosed from considering a lesser offense because of the alleged instructional error. We therefore find *Sanchez* distinguishable from this case.

Flores-Ventura does not challenge the validity of the attempted murder instructions. He objects instead to what he characterizes as the ambiguous description of "defendant," which he contends could apply to either himself or Flores. Flores-Ventura argues this ambiguity would have been clarified had the instructions identified Flores by name as the direct perpetrator of the attempted murder. Where a challenged jury instruction is ambiguous, the reviewing court evaluates whether there is a reasonable likelihood the jury misunderstood and misapplied the instruction. (*People v. Smithey* (1999) 20 Cal.4th 936, 963.)

To the extent the attempted murder instructions can be viewed as ambiguous, any ambiguity was overcome by the fact the primary basis for Flores-Ventura's culpability for attempted murder was as an aider and abettor. The prosecutor argued that for Flores-Ventura to be guilty of murder in count 1, the jury had to consider the deliberation and premeditation of the perpetrator, the shooter. The prosecutor further argued the jury had to consider the *shooter's intent* during the attempted murder alleged in count 2, emphasizing that Flores-Ventura was guilty as an aider and abettor. Following up from the prosecutor's theory of liability, defense counsel argued his client did not aid and abet the robbery or either shooting.

19.

The primary basis for Flores-Ventura's liability for both murder and attempted murder was as an aider and abettor, although the prosecutor also noted Flores-Ventura could be guilty on a theory of an uncharged conspiracy. The oral argument of the attorneys focused the jury's attention on the intent of Flores as the perpetrator of both the murder and the attempted murder. In their arguments concerning whether Flores-Ventura committed attempted murder as an aider and abettor, neither attorney argued the jury should consider Flores-Ventura's intent.

The jury received three instructions on aiding and abetting that were not limited to the murder allegation in count 1 but applied equally to the attempted murder allegation in count 2. These instructions explained the "defendant" knew the perpetrator committed the crime, intended to aid and abet him, and the jury had to determine whether the "defendant" acted as an aider and abettor who could reasonably foresee that murder and/or attempted murder were natural and probable consequences of the target offense.

Viewing the evidence presented at trial, it would have been clear to the jury that the perpetrator referred to in the aiding and abetting instructions was Flores and the "defendant" referred in the same instructions could only have been Flores-Ventura. Looking specifically at CALCRIM No. 401, the jury was instructed on how to evaluate whether the defendant was guilty as an aider and abettor to the perpetrator who committed the crime. The only defendant being evaluated as an aider and abettor was Flores-Ventura.

On appeal, we presume jurors are intelligent and are capable of understanding the trial court's instructions and applying them to the facts of the case. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.) The jury instructions must be read as a whole to determine whether it was reasonably likely the jury misconstrued the instructions. (*Id.* at p. 1223; *People v. Cain* (1995) 10 Cal.4th 1, 36, questioned on another ground in *People v. Moon* (2005) 37 Cal.4th 1, 17-18.) Reading the instructions as a whole, we find the jury would not have confused the word "defendant" as used in the attempted murder instructions with Flores-Ventura. The jury would have understood that in the context of

20.

the entire case, it had to view the perpetrator's intent in committing attempted murder. Indeed, Flores-Ventura's contention rests on *not* reading the instructions as a whole and presuming the jury would not have understood the reference to the "defendant" in the attempted murder instructions as being a reference to the perpetrator as defined in the aider and abettor instructions.

We find the ambiguity, if any, in the reference in the aiding and abetting instructions to "defendant" in the attempted murder instructions was overcome given the evidence adduced at trial, the instructions read as a whole, including the fact the aiding and abetting instructions applied to both the murder and attempted murder allegations, and the closing oral arguments of the prosecutor and defense counsel. The argument of the parties was consistent with and did not deviate from the trial court's instructions. We conclude the use of the word "defendant" in the attempted murder instructions did not negate the element of intent or direct the jury to evaluate Flores-Ventura's intent rather than the direct perpetrator's intent.

Assuming arguendo the jury may have improperly considered Flores-Ventura's intent in the commission of attempted murder rather than the direct perpetrator's intent, we agree with the People that the error is harmless. Because the purported error allegedly affects an element of the offense, we apply the harmless beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18. (*Neder v. United States*, *supra*, 527 U.S. at pp. 16-20; *People v. Gonzalez* (2012) 54 Cal.4th 643, 662-663; *People v. Flood* (1998) 18 Cal.4th 470, 502-506, criticized on another ground in *People v. McCall* (2004) 32 Cal.4th 175, 187, fn. 14.)

To find the error harmless, we must determine beyond a reasonable doubt that the jury actually made the necessary findings under a valid theory, or that a reasonable jury would have made the necessary findings under a valid theory. (*People v. Concha* (2010) 182 Cal.App.4th 1072, 1089.) In other words, we must be confident that if this jury or a reasonable jury had considered a valid theory, it would have convicted defendant.

21.

One valid theory this jury, or a reasonable jury, could have considered to find Flores-Ventura guilty of attempted murder was the uncharged conspiracy theory. The jury was directed to determine whether the two defendants agreed in advance to commit robbery, one or both defendants intended one or both of them to commit robbery, and one of four overt acts occurred in California to commit the robbery. The jury was instructed the four possible overt acts were: driving to the dairy, being armed with firearms, covering their faces, and entering the dairy. There was substantial evidence both defendants had a prior agreement and intent to commit robbery. There also was substantial evidence of all four overt acts. We are confident the jury would have convicted Flores-Ventura of attempted murder based on the uncharged conspiracy theory.

We also note that had the jury considered Flores-Ventura's intent for attempted murder rather than the direct perpetrator's intent, this would have been potentially beneficial to Flores-Ventura because the jury could have evaluated the evidence mitigating Flores-Ventura's culpability. For instance, the jury could have evaluated the fact Flores-Ventura did not fire any shots at either victim. Such consideration would have made the People's case against Flores-Ventura more difficult to prove and would not have prejudiced him. The error in *Sanchez* where the instruction foreclosed jury consideration of a lesser offense did not occur here. We conclude any error in the attempted murder instructions was harmless beyond a reasonable doubt.

3.     **Joint and Several Liability for Victim Restitution**

Both defendants assert the trial court erred in imposing the direct victim restitution award of $9,074.88 pursuant to section 1202.4, subdivision (f) because the trial court did not make them jointly and severally liable for the award. The People argue this claim is subject to forfeiture because neither defendant challenged the trial court's restitution award at sentencing, and although the trial court can make a restitution award joint and several, it is not mandated to do so.

We agree with the People that the failure to raise this issue to the trial court constitutes forfeiture. (See *People v. Smith* (2001) 24 Cal.4th 849, 852.) On the merits,

22.

defendants have not cited and we have not found authority that a direct victim restitution order has to be made on the basis of joint and several liability. The trial court has the authority to make a direct victim restitution order on the basis of joint and several liability where there are two or more defendants. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535; *People v. Madrana* (1997) 55 Cal.App.4th 1044, 1049-1052.) The statute, however, does not mandate direct victim restitution awards be made jointly and severally. We reject this contention.

**4.     Additional Day of Custody Credit**

Both defendants contend, and the People concede, they are entitled to an additional day of presentence custody credit. The defendants were both arrested on April 28, 2008, and sentenced on June 21, 2013. They were each awarded 1,880 days of custody credit for time actually spent in custody. The actual span of time between arrest and sentencing, however, is 1,881 days. Both defendants are entitled to one more day of custody credit. (*People v. Bravo* (1990) 219 Cal.App.3d 729, 735.)

## DISPOSITION

The case is remanded to the trial court to correct the abstract of judgment for each defendant to add one additional day of presentence custody credit, for a total of 1,881 days, and to forward the amended abstract of judgment for each defendant to the appropriate authorities. The judgments of both defendants are otherwise affirmed.

_____
                                                              PEÑA, J.

WE CONCUR:


_____
DETJEN, Acting P.J.


_____
FRANSON, J.

23.