118 P.3d 935 (2005)
STATE of Washington, Respondent,
v.
Michael Howard WALKER, Appellant.
State of Washington, Respondent,
v.
Richard Lee Garrison, Appellant.
Nos. 54299-1-I, 54431-4-I.
Court of Appeals of Washington, Division 1.
August 29, 2005.
*936 Dana M. Lind, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant Michael Howard Walker.
Dana Cashman, King County Prosecutor's Office, Seattle, WA, for Respondent State of Washington.
Sarah M. Hrobsky, Gregory C. Link, Washington Appellate Project, Seattle, for Appellant Richard Lee Garrison.
Carla B. Carlstrom, King County Prosecutor's Office, for Respondent State of Washington.
GROSSE, J.
¶ 1 After Crawford v. Washington,[1] testimonial hearsay is inadmissible unless the witness is unavailable and there was a prior opportunity to cross-examine with regard to the statement. A statement elicited in response to structured police questioning in the course of a police investigation as that involved here is testimonial. In contrast, the statements of an 11-year-old in response to the questions by her concerned mother, who sensed something was bothering her daughter, are not testimonial and not inadmissible under Crawford.
¶ 2 In addition, where a suspect has received Miranda[2] warnings the invocation of the right to remain silent must be clear and unequivocal in order to be effectual. Richard Garrison's statements to police that he did not want to incriminate himself while he continued to speak with them over several hours do not amount to a clear and unequivocal invocation.
¶ 3 We reverse the conviction of Michael Walker because the principal evidence against him was the testimonial hearsay of Steven Canady. We affirm Richard Garrison's convictions.

FACTS

State v. Walker
¶ 4 Michael Walker was charged with first degree assault against Steven Canady, allegedly occurring while both were housed in the King County jail. Walker was awaiting trial on two counts of first degree assault when, during an altercation with Canady, he allegedly *937 bit Canady in the face, removing a piece of skin.
¶ 5 At trial, several corrections officers testified, as well as the jail's nurse, but Canady did not testify. Nurse Susanne Strommer testified that she was handing out medication when Canady asked her a question about medication. She instructed him to fill out a form stating his concerns and that she would return to collect it. She testified that a few minutes later she saw out of her peripheral vision "a darker figure . . . flying through the air[.]"[3] When she finally focused on the scene she saw Canady sitting on top of Walker and noticed blood dripping from Canady's face.[4] She alerted Officer Dan Viscalla that the two inmates were fighting and she then "got right out of the way."[5]
¶ 6 Officer Viscalla responded to Strommer's report of a fight and testified that when he arrived he saw Walker straddling Canady and hitting his head to the floor.[6] At Officer Viscalla's direction, the two stopped fighting. Officer Viscalla testified that when Canady stood up, it looked like he had blood on his face. He did not see how the fight started or how Canady sustained his injury.
¶ 7 Officer Almond Braden also responded to the fight. When the fight ended he testified that he instructed Canady to exit the cell because he was bleeding badly from the face. He told Canady to have a seat in a chair and he got him a towel. Officer Braden then retrieved a piece of flesh from the cell floor and placed it in a paper cup.
¶ 8 Officer Kua Chasengnou was called to respond to the south wing of the jail. When he arrived, Canady was seated on a chair holding a towel to his neck. Canady told him several times that he had been bit. Officer Chasengnou then escorted Canady to triage. At trial, the jail's staff physician who treated Canady testified that Canady suffered from a bite wound to his face that went through all three layers of his skin.
¶ 9 Walker testified on his own behalf and told the jury that he had been sleeping and awoke to find Canady going through his property. He asked Canady what he was doing and Canady responded that he was looking for a pencil to fill out the form for the nurse. Walker explained that the two then exchanged words, including a few expletives, before Walker got up out of bed and went to go push the call button to request help from the officers. Walker testified that as he got out of bed to go push the call button Canady "socked [him] in the left temple region of [his] head."[7] Walker said he then blacked out and the next thing he remembered was sitting in the middle of the cell floor covered with blood.
¶ 10 Over defense objections, the trial court admitted Canady's version of events through Seattle Police Officer David Larrabee. Officer Larrabee initiated a police investigation by first interviewing inmates at the jail and then Canady at the hospital, some two hours after the incident. Officer Larrabee testified that during the interview, Canady told him the following:
[Officer Larrabee] A. He told me that it had all begun with him requesting a card to fill out regarding his medications that he was receiving and that with this card he needed something to write with and had gone to get a pencil from one of the bunks that he had borrowed the pencil from before, that he had gone over to get it and he stated that he was complaining out loud to himself something about not being able to see very well and complaining that he had to fill out the card and that he then was encountered by Mr. Walker and 
[Prosecutor] Q. I'm sorry, what do you mean by  Well, tell me what he said about it?
. . .
[Officer Larrabee] A. He stated that Mr. Walker had told him to stop his [expletive] whining.
[Prosecutor] Q. All right. What did he tell you next?

*938 [Officer Larrabee] A. Uhm  He then explained to me that they had exchanged FU's back and forth and that Walker jumped out, took a swing at them with a left fist; that he was able to block it, and at that time Walker then was trying to put his eyes out with his fingers, and during that Walker was not being successful in poking his eyes, so that he grabbed a hold of him, brought him in close to him; that's when he felt him latch onto his face.
[Prosecutor] Q. All right. What did he tell you next?
[Officer Larrabee] A. That they went falling over a bunk and once he had gotten out he knew that he had a wound to his face.[8]
The court allowed this testimony under the excited utterance hearsay exception.
¶ 11 Walker was convicted of first degree assault. He now appeals his conviction, arguing that the admission of Canady's out-of-court statement to Officer Larrabee violated his confrontation rights under Crawford. He also appeals the admission of testimony about his prior convictions, claims his counsel was ineffective, and argues the court erred in imposing consecutive sentences.

State v. Garrison
¶ 12 On September 28, 2003, 11-year-old C.M. returned home after spending the weekend at her grandfather Richard Garrison's house. When she returned home her mother, Bobbi Marx, sensed something was wrong. She asked C.M. if something had happened. C.M. said, "Yes." She then asked C.M., "Was it my dad?" C.M. said, "Yes." She then asked her, "Did he try to touch you?" And C.M. replied, "Yes."[9]
¶ 13 The next day Garrison came over to his daughter's house and spoke outside with Bobbi and her father-in-law, Malcolm Marx. According to Malcolm, Garrison told him that he had inappropriately touched C.M. the night before. Malcolm then went inside the house and told Bobbi what Garrison had said. Bobbi then came out to speak with Garrison. Garrison pleaded for her to help him. Bobbi initially did not report the abuse to the police because she believed the family could work it out.
¶ 14 In the early morning of October 7, 2003, C.M., her mother, and her 3-year-old brother were home sleeping when Garrison broke into the home. Garrison shoved something in C.M.'s mouth, threatening to kill her brother if she did not keep quiet. C.M. could see Garrison had a knife and began to scream. Her screams woke her mother and her other grandfather. Garrison fled. In the struggle with Garrison, C.M. was cut by the knife Garrison had been holding. C.M.'s family immediately called the police and Garrison was arrested.
¶ 15 During the police investigation, Bobbi telephoned Garrison with the police listening in on the line. In that conversation, Garrison admitted that he had touched C.M. He told Bobbi that he had "woke up evil" after taking his medication and that he did not know why it happened.[10]
¶ 16 On November 20, 2003, Garrison was interviewed by Detective Rick Bourns. Before the interview, Detective Bourns advised Garrison of his Miranda rights and Garrison signed a form waiving those rights. During the four and one half hour interview Garrison never stopped talking and never said that he did not want to talk to the police anymore. However, he did say many times that he did not want to say anything that would make him look guilty or anything that would incriminate him. During the interview, Garrison issued a statement admitting that he had reached under C.M.'s pajama bottoms and rubbed her pubic area. He also admitted that he had taken a knife over to his daughter's house in an attempt to remove C.M. from the house.
¶ 17 The trial court held a CrR 3.5 hearing to determine the admissibility of the statement. The court found a difference between Garrison saying he did not want to talk at all and saying he did not want to say anything that would incriminate himself. The trial *939 court thus deemed the statement admissible and it was read to the jury at trial.
¶ 18 Also at trial, the court allowed C.M.'s out-of-court statement to her mother to be admitted through her mother as fact of complaint/hue and cry evidence. The ruling apparently was granted with the understanding that C.M. would then testify. The defense did not object to this ruling.
¶ 19 Bobbi testified as to C.M.'s out-of-court statement; however, when C.M. took the stand she refused to answer the prosecutor's questions related to the alleged molestation. After the prosecutor's unsuccessful attempt to get C.M. to testify orally to the alleged molestation, the prosecutor drew a body sketch and asked C.M. to mark an "X" on the spot where Garrison touched her. She marked the pubic area.
¶ 20 The jury convicted Garrison of child molestation in the first degree and burglary in the first degree with a deadly weapon. Garrison was acquitted of attempted kidnapping in the first degree with a deadly weapon. Garrison appeals the child molestation conviction, claiming that his constitutional right against self incrimination was violated when the trial court admitted his custodial statement taken after he repeatedly said he did not want to say anything that would incriminate him. He also claims his constitutional right to confront witnesses against him was violated pursuant to Crawford v. Washington when the trial court admitted C.M.'s out-of-court statement made to her mother, and C.M. subsequently refused to answer questions about the alleged molestation at trial.

ANALYSIS

Crawford
¶ 21 In Crawford v. Washington, the United States Supreme Court established a rule barring admission of testimonial hearsay absent witness unavailability and a prior opportunity to cross-examine with regard to the statement.[11] Because it was unnecessary to resolve the case, the Crawford Court left for "another day any effort to spell out a comprehensive definition of `testimonial.'"[12] However, the Crawford Court did provide some guidance on the issue. The Court determined from the historical record that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused" and that "[t]he Sixth Amendment must be interpreted with this focus in mind."[13] With this in mind the Court then listed various formulations of what it determined to be a "core class" of testimonial statements:
Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalentthat is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[14]
¶ 22 Additionally, the Court determined that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard" whether or not they are sworn statements.[15] The Court indicated that "[p]olice interrogation" should be given its colloquial meaning and that a recorded statement "knowingly given in response to structured police questioning, qualifies [as interrogation] under any conceivable *940 definition."[16] And in a subsequent case, the United States Supreme Court found that "police questioning during a Terry stop qualifies as an interrogation," and that "responses to such questions are testimonial in nature."[17]
¶ 23 Crawford also refers to types of hearsay that are not testimonial. These include: (1) "[a]n off-hand, overheard remark;"[18] (2) "a casual remark to an acquaintance;"[19] (3) "business records or statements in furtherance of a conspiracy;"[20] and (4) "statements made unwittingly to an FBI informant" by a co-conspirator.[21]
¶ 24 In Crawford, Michael Crawford was charged with assault and attempted murder. His wife, Sylvia Crawford, was taken into custody by the police and questioned. "Sylvia Crawford made her statement while in police custody, herself a potential suspect in the case. . . . In response to often leading questions from police detectives, she implicated her husband in [the] stabbing and at least arguably undermined his self-defense claim."[22] Sylvia did not testify at trial because of the marital privilege, but instead her tape recorded statement was played at trial. The Crawford Court held that Sylvia's recorded statement to police investigators was testimonial "under any conceivable definition" and found the statement inadmissible because it had not been subject to cross-examination.[23]

State v. Walker
¶ 25 Whether the admission of Canady's out-of-court statement to Officer Larrabee violated Walker's confrontation rights turns on whether his statement is testimonial in nature. We find Canady's statement given to a police investigator was testimonial. Like the statement in Crawford, Canady's statement was elicited in response to structured police questioning pursuant to a police investigation. Canady gave a detailed narrative statement to a police investigator, in the hospital, more than two hours after the incident occurred. In light of these circumstances and the holding in Crawford, it is clear that Canady's statement to the police was testimonial.
¶ 26 However, the State argues that excited utterances by their very nature cannot be considered testimonial, and because the statement in this case was admitted as an excited utterance, it cannot be testimonial. We decline to adopt a per se rule stating that all excited utterances cannot be testimonial.
¶ 27 In fact, in State v. Powers,[24] this court recently declined to adopt such a rule. There, the court found that a 911 recording that had been admitted as an excited utterance was testimonial.[25] The trial court had admitted as an excited utterance a recording of a 911 call from a woman reporting that her ex-boyfriend had been over to her house in violation of a domestic violence protective order.[26] The Powers court found that the statement was testimonial because the record showed that the woman "called 911 to report Power's violation of the existing protective order and described Powers to assist in his apprehension and prosecution, rather than to protect herself or her child from his return."[27] In response to similar arguments *941 offered by the State in this case, the Powers court correctly concluded that "despite [the recording's] characterization [as an excited utterance], based on indicia of reliability and trustworthiness, Crawford clearly rejects the admission of testimonial statements based on `the vagaries of the rules of evidence, much less . . . amorphous notions of "reliability."'"[28] The court held that instead, the trial court should assess on a case-by-case basis whether a 911 recording is testimonial or not and whether the statement originates from interrogation.[29]
¶ 28 More recently, the Washington Supreme Court addressed a similar issue in State v. Davis.[30] In that case, the court, in apparent agreement with the Powers court, affirmatively stated: "We hold that emergency 911 calls should be assessed on a case-by-case basis and that the statements made should be individually evaluated for admissibility in light of the confrontation clause"[31] and noted that the Crawford Court had rejected the "use of evidentiary rules and `amorphous notions of reliability' in assessing whether the protections of the confrontation clause have been satisfied."[32]
¶ 29 We agree with the rationale employed by the Powers court. Thus, in spite of the trial court's characterization of Canady's statement as an excited utterance, and because Canady's narrative statement was given in response to structured police questioning pursuant to a police investigation, his statement was testimonial for Crawford purposes. And because Walker did not have the opportunity to cross-examine Canady, his right to confrontation was violated.
¶ 30 However, our analysis does not end there. Confrontation clause violations are subject to harmless error analysis.[33] The error is harmless only if upon examining the record we conclude "`beyond a reasonable doubt that the jury verdict would have been the same absent the error.'"[34] Factors bearing on this inquiry include:
the importance of the witness' testimony [in the prosecution's case], whether the testimony was cumulative, the presence or absence of evidence corroborating or contradictory testimony [of the witness] on material points, the extent of cross-examination otherwise permitted, and, [of course,] the overall strength of the prosecution's case.[35]
¶ 31 The record does not support a finding of harmless error. Canady's statement is the only testimony in the record that rebuts Walker's version of the fight. The corrections officers and the nurse saw the fight during various stages but could not testify as to what provoked the fight and none of the witnesses saw Walker bite Canady. Walker's defense was essentially that he suffered from automatism and that when Canady started the fight by hitting him in the head, he blacked out and lost control of himself. Walker's counsel argued at closing that perhaps Canady's statement was unreliable because he was trying "to save his own skin."[36]
¶ 32 A reasonable jury could have concluded upon hearing only Walker's testimony and not Canady's statement that Canady was the one who initiated the fight and Walker bit Canady in self-defense. Thus, we cannot conclude that the jury's verdict of first degree assault would have been the same without the erroneous admission of Canady's *942 statement. Because the erroneous admission of Canady's out-of-court statement to Officer Larrabee requires reversal, we need not address Walker's other claims.

State v. Garrison
¶ 33 Under the facts of Garrison, we come to a different conclusion. C.M.'s statements were not made in court, nor were they contained in formalized testimonial materials, nor were they made in response to police interrogations. To the contrary, C.M.'s statement was made in response to questioning by her concerned mother immediately after C.M. had returned from Garrison's house.
¶ 34 Garrison argues that the statement was testimonial because Bobbi initiated the conversation and had asked C.M. questions that were structured to gather evidence to be used against Garrison. However, while it is true that Bobbi initiated the conversation, there is nothing in the record that suggests that Bobbi interrogated her daughter for the purposes of gathering information with which to prosecute Garrison. To the contrary, Bobbi testified at trial that upon learning of the assault she did not contact the authorities because she thought the family could work it out.[37] Bobbi only reported the alleged molestation after Garrison had broken into her home and injured C.M.
¶ 35 Nor does the record indicate that C.M. asked her mother to take any action against Garrison. And nothing in the record supports the conclusion that C.M., an eleven year-old, reasonably believed the statements to her mother could or would be available for use in a trial. The record indicates that the exchange between Bobbi and C.M. was that of a conversation between a concerned parent and an upset child, nothing more. Therefore, we find that C.M.'s statements to her mother were not testimonial and are admissible.
¶ 36 Even if C.M.'s statement to her mother had been erroneously admitted, any such error would have been harmless. The State had a very strong case, even without C.M.'s statements to her mother. Garrison made a statement to Detective Bourns in which he admitted to touching C.M.'s pubic area. Additionally, both Garrison's daughter and his daughter's father-in-law testified that Garrison admitted to them that he had molested C.M.[38] Furthermore, C.M.'s mother testified that she could tell something was wrong with C.M. when she returned home from Garrison's house. And finally, before the jury, C.M. marked the pubic area on a body sketch when asked where Garrison had touched her.[39] This evidence taken together convinces us beyond a reasonable doubt that the jury would have convicted Garrison even if they had not been permitted to hear C.M.'s statement to her mother.

Admissibility of Garrison's Custodial Statement
¶ 37 Under Miranda, the police must cease questioning a suspect if that individual in any manner and at any time prior or during questioning indicates he or she wishes to invoke the right to remain silent.[40] Furthermore, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'"[41] Here, Garrison did not tell the police that he wished to remain silent, but instead said that he did not want to say anything that would make him look guilty or incriminate him. He then continued to speak with police for several hours and signed a highly incriminating statement. At no time during the police interview did Garrison stop talking or say that he did not want to talk to the police anymore.
¶ 38 At best, Garrison's statements to Detective Bourns were equivocal as to whether he wanted to invoke his right to remain *943 silent. This raises the issue of whether the police were obligated to stop and clarify whether Garrison was invoking his right to remain silent before proceeding with the interview. As this is a case of first impression in Washington, both parties look to case law addressing the officer's obligations during an interrogation when a suspect is equivocal in invoking his right to counsel.
¶ 39 In 1982, the Washington Supreme Court adopted a rule requiring that "[a]ny questioning after the equivocal assertion of the right to counsel must be strictly confined to clarifying the suspect's request."[42] In doing so our Supreme Court citied the United States Supreme Court's apparent approval of this rule as outlined in a Fifth Circuit case.[43]
¶ 40 However, in Davis v. United States, the United States Supreme Court has since addressed this issue directly and concluded that after a knowing and voluntary waiver of Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.[44] The Court explicitly declined to adopt a rule requiring officers to ask clarifying questions when presented with an ambiguous or equivocal request for an attorney.[45] While the Davis Court recognized that requiring a clear assertion of the right to counsel might disadvantage some suspects who for a variety of reasons will not clearly articulate their right to counsel although they actually want a lawyer present, the Court reasoned that "the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves."[46]
¶ 41 Very recently, this court has addressed the issue of whether the Davis rule extends to a suspect's right to remain silent in so far as it requires a suspect to clearly articulate his or her invocation of the remain silent.[47] In Hodges, this court held that "[t]he right to remain silent need not be articulated so long as it is clear and unequivocal."[48] The Hodges court therefore departed from Davis in so far as whether the invocation of the right to remain silent must be articulated, but was consistent with Davis' requirement that the invocation be "clear and unequivocal."[49]
¶ 42 Thus, following the directive of the United States Supreme Court in Davis and our own lead in Hodges, we hold that where a suspect has received Miranda warnings the invocation of the right to remain silent must be clear and unequivocal (whether through silence or articulation) in order to be effectual; if the invocation is not clear and unequivocal, the authorities are under no obligation to stop and ask clarifying questions, but may continue with the interview. Applying this rule to the facts before us, the *944 authorities were under no obligation to ask Garrison clarifying questions before proceeding with the interview. Garrison's statement that he did not want to say anything incriminating coupled with his willingness to continue speaking with the police for several hours was not a clear and unequivocal invocation of his right to remain silent and his statements are thus admissible.
¶ 43 For the above reasons, we affirm the judgment and sentence against Garrison, and we reverse Walker's first degree assault conviction, and remand Walker's case for a new trial.
WE CONCUR: ELLINGTON, A.C.J., and COX, C.J.
NOTES
[1] Crawford, 541 U.S. 36, 124 S.Ct. 1354, 1370, 158 L.Ed.2d 177 (2004).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Report of Proceedings (RP) at 53.
[4] RP at 53-54.
[5] RP at 55.
[6] RP at 25.
[7] RP at 103.
[8] RP at 72-73.
[9] RP at 140-41.
[10] RP at 150.
[11] Crawford, 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[12] Crawford, 541 U.S. at 68, 124 S.Ct. 1354.
[13] Crawford, 541 U.S. at 51, 124 S.Ct. 1354.
[14] Crawford, 541 U.S. at 52, 124 S.Ct. 1354 (citations omitted) (quoting White v. Illinois, 502 U.S. 346, 365, 112 S.Ct. 736, 747, 116 L.Ed.2d 848 (1992)).
[15] Crawford, 541 U.S. at 52, 124 S.Ct. 1354.
[16] Crawford, 541 U.S. at 53 n. 4, 124 S.Ct. 1354.
[17] Hiibel v. Sixth Judicial District Court Of Nevada, Humboldt County, 542 U.S. 177, 124 S.Ct. 2451, 2463, 159 L.Ed.2d 292 (2004).
[18] Crawford, 541 U.S. at 51, 124 S.Ct. 1354.
[19] Crawford, 541 U.S. at 51, 124 S.Ct. 1354.
[20] Crawford, 541 U.S. at 56, 124 S.Ct. 1354.
[21] Crawford, 541 U.S. at 58, 124 S.Ct. 1354 (citing Bourjaily v. United States, 483 U.S. 171, 181-84, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).
[22] Crawford, 541 U.S. at 65, 124 S.Ct. 1354.
[23] Crawford, 541 U.S. at 53 n. 4, 124 S.Ct. 1354.
[24] Powers, 124 Wash.App. 92, 99 P.3d 1262 (2004).
[25] See Powers, 124 Wash.App. 92, 99 P.3d 1262. But see State v. Orndorff, 122 Wash.App. 781, 787, 95 P.3d 406 (2004) (witness had no reason to expect that her statement would be used in prosecution because her statement "was a spontaneous declaration made in response to the stressful incident she was experiencing").
[26] Powers, 124 Wash.App. 92, 99 P.3d 1262.
[27] Powers, 124 Wash.App. at 102, 99 P.3d 1262.
[28] Powers, 124 Wash.App. at 99-101, 99 P.3d 1262 (quoting Crawford, 541 U.S. at 61, 124 S.Ct. 1354).
[29] Powers, 124 Wash.App. at 101, 99 P.3d 1262.
[30] State v. Davis, 154 Wash.2d 291, 111 P.3d 844 (2005).
[31] Davis, 154 Wash.2d at 295, 111 P.3d 844.
[32] Davis, 154 Wash.2d at 303, 111 P.3d 844.
[33] Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); United States v. Nielsen, 371 F.3d 574 (9th Cir.2004); State v. Portnoy, 43 Wash.App. 455, 462, 718 P.2d 805 (1986).
[34] State v. Brown, 147 Wash.2d 330, 341, 58 P.3d 889 (2002) (quoting Neder v. United States, 527 U.S. 1, 19, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).
[35] Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431; Nielsen, 371 F.3d 574 (9th Cir.2004); Portnoy, 43 Wash.App. at 462, 718 P.2d 805.
[36] RP at 235.
[37] RP at 141.
[38] RP at 149, 212.
[39] RP at 198.
[40] Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602.
[41] Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (quoting Miranda, 384 U.S. at 474, 86 S.Ct. 1602).
[42] State v. Robtoy, 98 Wash.2d 30, 39, 653 P.2d 284 (1982) (citing Nash v. Estelle, 597 F.2d 513 (5th Cir.) (en banc), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979), Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979), and Edwards v. Arizona, 451 U.S. 477, 486 n. 9, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)).
[43] Robtoy, 98 Wash.2d at 39, 653 P.2d 284 (citing Nash, 597 F.2d 513 (5th Cir.) (en banc), cert. denied, 444 U.S. 981, Thompson, 601 F.2d at 771, and Edwards, 451 U.S. at 486 n. 9, 101 S.Ct. 1880).
[44] Davis, 512 U.S. at 461, 114 S.Ct. 2350.
[45] Davis, 512 U.S. at 461-62, 114 S.Ct. 2350.
[46] Davis, 512 U.S. at 460, 114 S.Ct. 2350. Robtoy has continued to appear in Washington case law in spite of the Davis Court's clear directive. In one post-Davis case, State v. Aten, our supreme court acknowledged that under Robtoy a police investigator could have asked a suspect clarifying questions after her equivocal request for an attorney, but because the officer ceased questioning completely, there was no constitutional error. See Aten, 130 Wash.2d 640, 665-66, 927 P.2d 210 (1996). Subsequent court of appeals decisions have interpreted Aten as Washington's official rejection of the Davis rule. See State v. Jones, 102 Wash.App. 89, 96, 6 P.3d 58 (2000) ("Washington follows Edwards but not Davis."); State v. Aronhalt, 99 Wash.App. 302, 307, 994 P.2d 248 (2000). However, our supreme court made no mention at all of Davis in Aten. As it seems unlikely that our supreme court would reject a directive from the United States Supreme Court without explanation (if that is indeed what it intended to do), we look to Davis for guidance here.
[47] State v. Hodges, 118 Wash.App. 668, 77 P.3d 375 (2003).
[48] Hodges, 118 Wash.App. at 673, 77 P.3d 375.
[49] Hodges, 118 Wash.App. at 673, 77 P.3d 375.