# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47481-6-II |
| Respondent, | |
| v. | |
| TYSON JAMES KILLION, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Tyson James Killion appeals his conviction for assault in the second degree. He argues that insufficient evidence supported his conviction and that the State committed prosecutorial misconduct. Because sufficient evidence existed and the prosecutor's statements did not constitute misconduct, we affirm the trial court.

### FACTS

The State charged Killion with domestic violence assault in the second degree. The jury found Killion guilty of assault in the second degree and found that Killion and the victim, Ashley Williams, were members of the same family or household.

On July 27, 2014, in downtown Olympia, Kevin Reynolds observed a man and woman walking down the street towards him as he sat in his truck. As they approached, Reynolds saw the man throw the woman, later identified as Williams, to the ground and kick her in the face. The man, a white male, in his mid-twenties to mid-thirties, with blondish or reddish hair, who was

wearing a white t-shirt and holding a bag, then ran away from her and toward the Capitol building. It appeared as though people were chasing the man.

At roughly the same time, Denise Luikart and Gregory Waldron arrived on the same street in their car. They witnessed Williams laying on the ground and a man moving away quickly, yelling, and being followed by other people. Luikart and Waldron called 911 and followed the man in their car, hearing him say things like, "She deserved it" and "I was minding my own business. I work hard." 1 Report of Proceedings (RP) at 66. The man, who was wearing a white shirt, also said "She deserved it" and "The bitch deserved it. She cheated on me. I was nothing but good to her," while he was pointing back at Williams. 1 RP at 82-83.

Luikart and Waldron followed the man until he merged with a large crowd of people by a church. They then lost sight of him. Shortly thereafter, they saw the man sitting on the steps of the church but he wore a purple shirt. They contacted the police and pointed the man out to an officer. The officer attempted to contact the man, later identified as Killion, but he walked away. Killion then held a blade to his own throat and made various comments, such as that he wanted to smoke a cigarette and, "The bitch broke my heart." 1 RP at 139. Killion did not cooperate with the police and an officer used a taser on him. Police then took him into custody. While he was standing next to the arresting officer, Killion blurted out, "I fucking loved her, man." 1 RP at 164.

At the time Officer Jeff Herbig arrived, Killion was in police custody. 1RP at 168. Herbig advised Killion of his *Miranda*[1] rights; asked if Killion understood the rights, to which Killion responded he did; and, asked Killion if he would answer questions, to which Killion responded, "Yes." 1 RP at 171. Killion answered several questions about his relationship with Williams. Killion told the officer that Williams had been his girlfriend, that the incident involved his

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

girlfriend, and that he had just been with Williams when she told him she "cheated on him." 1 RP at 173. Then, when Herbig asked Killion what occurred physically between them, Killion responded, "I don't know." 1 RP at 173. Herbig asked questions several times about how Williams had been injured and Killion kept responding, "I don't know." 1 RP at 174. Herbig finally asked, "Do you not know how she became injured, or you just don't remember or are unwilling to share?" to which Killion answered, "I don't know." 1 RP at 174.

After the police arrested Killion, they did a show up with Reynolds, Luikart, and Waldron. Reynolds did not think the man police arrested was the same man he saw kick Williams. Reynolds also stated he did not feel that he got a good look at the man involved in the incident because his "focus was more on the person lying on the ground at the time." 1 RP at 101. Although they noted the man was wearing a different shirt, both Luikart and Waldron confirmed, without doubt, that he was the same man they saw leaving the scene of the assault and yelling on the street.

During closing argument, the prosecutor recapped Herbig's interview with Killion. She stated that after Killion told Herbig about his relationship with Williams and Williams cheating on him, Herbig asked what else happened and asked how Williams got injured. The prosecutor stated that Herbig "[gave] the defendant the opportunity to deny what had happened. But the defendant's response [was]n't, 'What are you talking about? I didn't assault her.' His response [was] just, 'I don't know.'" 2 RP at 365-66.

Defense counsel did not object to these statements but, argued during closing argument that Killion was simply answering the question of whether he knew how Williams became injured by saying, "I don't know." 2 RP at 384. In rebuttal, the prosecutor stated that Herbig did not ask specific questions but asked Killion open-ended questions and gave Killion the opportunity to say in his own words what happened. The prosecutor stated,

You all can put yourself in a situation that you can imagine that you're receiving information that your girlfriend, whom you apparently love, has been injured badly. The police obviously think you did it. They have got you in custody. They just tased you, and they are asking you how did this happen? What would you say if it weren't you? You would say, I don't know what you're talking about, I wasn't there.

2 RP at 390. Defense counsel objected to "improper use of the defendant's silence," but while the court sustained the objection, it instructed that "the jury[ ] disregard the question of what would you do personally." 2 RP at 390.

The prosecutor continued on to argue,

The defendant wasn't silent. He made statements to law enforcement. He didn't invoke his right to remain silent. He didn't basically tell the police you're going to have to prove it. He made statements. He had the opportunity to provide an explanation, a defense, but he didn't. What he said was, 'I don't know.' Who says that? Someone who either truly doesn't know, who has no idea, and I submit to you that if the defendant were in that position, if he truly didn't know, he didn't hurt [Williams] and he didn't know how she got hurt, he might have been somewhat helpful.

2 RP at 391. Defense counsel objected again on the same grounds and the court overruled the objection. The prosecutor then wrapped up this line of argument by saying, "The defendant had the opportunity to make these—give these explanations, but he did not. He said he didn't know, right? But what we do know is that he had the motive and he had the opportunity and he has been identified by impartial, uninterested eye witnesses, people who don't have a dog in the fight." 2 RP at 391.

Killion appeals.

## ANALYSIS

I.  SUFFICIENCY OF THE EVIDENCE

Killion argues that the State failed to prove his identity, an essential element of assault in the second degree. We disagree.

The State is required to prove all elements of a crime charged beyond a reasonable doubt. *State v. Colquitt*, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). When considering whether sufficient evidence supports a criminal conviction, "we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

A person is guilty of assault in the second degree if he intentionally assaults another and thereby recklessly inflicts substantial bodily harm. RCW 9A.36.021(1)(a). The State must prove beyond a reasonable doubt that the person charged with the alleged crime, committed the acts forming the basis of the charge. *State v. Hill*, 83 Wn.2d 558, 560, 520 P.2d 618 (1974).

Killion contends that Luikart and Waldron did not see Killion assault Williams, and that Reynolds did not believe Killion was the assailant. However, Reynolds testified that as he sat in his truck on July 27 around the site of the assault, he observed a man and woman walking down the street towards him. As they approached, Reynolds saw the man throw Williams to the ground

and kick Williams in the face. The man was a white male, in his mid-twenties to mid-thirties, with blondish or reddish hair, who was wearing a white t-shirt and holding a bag, and then ran away from Williams toward the Capitol building.

At roughly the same time, Luikart and Waldron arrived on the street in their car and witnessed Williams laying on the ground and a man quickly moving away yelling, while followed by other people. Luikart and Waldron called 911 and followed the man, watched him from fairly up close to their car, and heard him say things like, "She deserved it" and "I was minding my own business. I work hard." 1 RP at 66. Waldron stated that the man, who was wearing a white shirt, said "She deserved it" and "The bitch deserved it. She cheated on me. I was nothing but good to her," while he was pointing back at Williams. 1 RP at 83. They followed him until he went into a large crowd of people by a church and then they lost sight of him. Shortly thereafter, they saw the man sitting on the steps of the church and pointed him out to police.

The police arrested that man and presented him to Reynolds, Luikart, and Waldron. Reynolds did not think the man the police arrested was the same man he saw kick Williams. Reynolds also stated he did not feel that he got a good look at the man involved in the incident because his "focus was more on the person lying on the ground at the time." 1 RP at 101. Although they noted the man was wearing a different shirt, both Luikart and Waldron confirmed, without doubt, that he was the same man they saw leaving the scene of the assault and yelling on the street.

Additionally, when the police attempted to contact the man, later identified as Killion, he walked away. He held a blade to his own throat and said things such as, "The bitch broke my

heart." 1 RP at 139. The officers that arrested Killion identified him in court as the man they arrested that day. Killion told an officer that Williams had been his girlfriend, that the incident involved his girlfriend, and that he had just been with Williams when she told him she "cheated on him." 1 RP at 173. Viewed in the light most favorable to the State and leaving all credibility and evidentiary weight decisions to the trier of fact, we conclude that sufficient evidence existed that Killion was the person who assaulted Williams.

II.     PROSECUTORIAL MISCONDUCT

Killion also argues the prosecutor committed prosecutorial misconduct by shifting the burden of proof to him during closing argument. We disagree.

An appellant claiming prosecutorial misconduct must demonstrate that the prosecutor's conduct was both improper and prejudicial. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). "In the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" *Fisher*, 165 Wn.2d at 747 (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014)). We review the prosecutor's comments during closing argument in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Sakellis*, 164 Wn. App. 170, 185, 269 P.3d 1029 (2011).

A.     RIGHT TO REMAIN SILENT

As a threshold issue, Killion argues that the prosecutor's statements during closing argument impermissibly commented on his right to remain silent. However, Killion did not invoke his right to remain silent. Therefore, the prosecutor did not comment on Killion's right to remain

silent, but instead, commented on what Killion said to police officers after knowingly and voluntarily waiving his right to remain silent.

We review the question of whether a defendant invoked his right to remain silent as a mixed question of law and fact, ultimately reviewed de novo. *State v. I.B.*, 187 Wn. App. 315, 319-20, 348 P.3d 1250 (2015). The invocation of the right to remain silent must be clear and unequivocal. *State v. Walker*, 129 Wn. App. 258, 276, 118 P.3d 935 (2005). The authorities are under no obligation to stop and ask clarifying questions, and may continue with the interview, if a statement is equivocal. *Walker*, 129 Wn. App. at 276. "The test as to whether a suspect's invocation of his right to remain silent was unequivocal is an objective one, asking whether 'a reasonable police officer in the circumstances would understand the statement' to be an invocation of *Miranda* rights." *I.B.*, 187 Wn. App. at 321 (quoting *State v. Piatnitsky*, 180 Wn.2d 407, 413, 325 P.3d 167 (2014) (internal quotation omitted)).

At the time Officer Herbig arrived, Killion was in police custody. Herbig advised Killion fully of his *Miranda* rights; asked if Killion understood the rights, to which Killion responded he did; and, asked Killion if he would answer questions, to which Killion responded, "Yes." 1 RP at 171. Killion answered several questions about his relationship with Williams. Then, when Herbig asked Killion what occurred physically between them, Killion responded, "I don't know." 1 RP at 173. Herbig asked questions several times about how Williams had been injured and Killion kept responding, "I don't know." 1 RP at 174. Herbig finally asked, "Do you not know how she became injured, or you just don't remember or are unwilling to share?" to which Killion answered,

"I don't know." 1 RP at 174. This answer was not an unequivocal invocation of his right to remain silent, but a response to police questioning.[2] Killion does not establish that the prosecutor erred.

####    B.    SHIFTING THE STATE'S BURDEN

Killion also argues that the State impermissibly relied on his refusal to give additional information as substantive evidence of guilt, thus shifting the burden of proof to Killion. However, Killion only asserts that the State did so by commenting on his right to remain silent. We conclude above that he did not invoke the right to remain silent.

Killion fails to argue a meritorious example of how the State shifted the burden. *See* RAP 10.3(a)(6). The State's argument below proposed that if Killion were innocent, he would have said something other than "I don't know." 2 RP at 390. Killion's response to Herbig's questions demonstrated some knowledge of the crime committed against Williams. A prosecutor may be entitled to argue the failure of a defendant to disclaim responsibility after he voluntarily waived his right to remain silent and questions and comments show knowledge of the crime. *See State v. Clark*, 143 Wn.2d 731, 765, 24 P.3d 1006 (2001); *State v. Young*, 89 Wn.2d 613, 621, 574 P.2d 1171 (1978). Therefore, we conclude Killion's prosecutorial misconduct claim fails.[3]

---

[2] Our conclusion here distinguishes the cases Killion relies on. *See* Br. of Appellant at 9-10 (citing *State v. Heller*, 58 Wn. App. 414, 420-21, 793 P.2d 461 (1990) (holding prosecutor's questions about defendant's silence during freedom from custodial interrogation were impermissible because the jury could interpret as implying guilt or a comment on the right to remain silent); *State v. Keene*, 86 Wn. App. 589, 594-95, 938 P.2d 839 (1997) (concluding prosecutor's error in commenting on defendant's right to remain silent was not harmless); *State v. Knapp*, 148 Wn. App. 414, 421, 199 P.3d 505 (2009) (concluding the prosecutor impermissibly commented on defendant's right to be silent)).

[3] In the conclusion of his brief, Killion asserts, "[T]he prosecutor committed prejudicial misconduct when he stated during closing arguments that an innocent person would assert his innocence when questioned by law enforcement and when he urged the jury to use Killion's refusal to claim innocence as substantive evidence of his guilt." Br. of Appellant at 15. However, he did not support this assertion with legal authority, citation to the record, or argument. We do not consider it. RAP 10.3(a)(3)-(6).

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Lee, J.

Sutton, J.