**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| THE STATE OF WASHINGTON<br><br>Respondent,<br><br>v.<br><br>JOSE JONAEL AYALA REYES<br><br>Appellant. | No. 81393-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — Ayala Reyes appeals his convictions for first degree murder and conspiracy to commit first degree murder. He claims that being forced to use his peremptory challenges on jurors who should have been excused for demonstrated racial bias was a structural error that deprived him of his right to a fair trial. He also claims the trial court erred in declining to suppress incriminatory statements he made during an interview with police and that his two crimes should be considered the same criminal conduct. We affirm.

FACTS

Jose Ayala Reyes is a 36 year old immigrant from El Salvador. He speaks Spanish and minimal English. In 2016, he lived in the Tacoma area.

In the spring of that year, Ayala Reyes began communicating with "Sicario."[1] Sicario is a member of the Mara Salvatrucha (MS-13) street gang.

---

[1] "Sicario" is a Spanish word meaning "assassin." It is the street name for an individual named Edenilson Misael Alfaro.

Ayala Reyes sent Sicario money for drugs and to buy weapons for the gang. He also went down to California to meet with Sicario.

After returning from California, Ayala Reyes rented an apartment at the Alladin Camelot complex. A few days later, he and his girlfriend met with Samuel Cruces Vasquez at the apartment to eat food and drink beer. Cruces Vasquez was Ayala Reyes's co-worker at a pizza shop.

After that meeting, Ayala Reyes exchanged text messages with Sicario planning to murder Cruces Vasquez. Ayala Reyes wanted to murder Cruces Vasquez in order to become a member of MS-13. On April 28, 2016, Ayala Reyes, his girlfriend, Sicario, and two other individuals named "Tas"[2] and "Sombra"[3] met at the apartment to plan the murder.

At the meeting, the four discussed details of how they would murder Cruces Vasquez. They decided that Ayala Reyes and Sombra would do the killing, because they were not yet members of MS-13. The four eventually decided they would lure Cruces Vasquez to them by calling him on Ayala Reyes's phone. The four put on dark jackets and passed out gloves for use during the murder.

They then left the apartment with Ayala Reyes's girlfriend, who they dropped off before proceeding to meet Cruces Vasquez. When they arrived, Ayala Reyes and Sombra entered Cruces Vasquez's car and each stabbed him. Cruces

---

[2] "Tas" is Cesar Chicas-Carballo's street name. It apparently refers to a tattoo on his body of the Tasmanian Devil (a cartoon character from the television show "Looney Tunes"). Tas is a member of MS-13.

[3] "Sombra" is Juan Gaitan Vasquez's street name. It is a Spanish word meaning "shadow." At the time of the meeting, Sombra was not yet a member of MS-13.

Vasquez got out of the car. Ayala Reyes and Sombra followed him out of the car, beat him, and left him lying in the street. Sometime after the assault, an unidentified vehicle ran over Cruces Vasquez. Cruces Vasquez later died of his injuries.

Police questioned Ayala Reyes in connection with the murder. Federal Bureau of Investigation Agent Dan Brewer conducted the interview in Spanish. Brewer is a fluent Spanish speaker. At the outset of the interview, Brewer explained Ayala Reyes's Miranda[4] rights to him in Spanish. As Brewer explained his Miranda rights, Ayala Reyes responded using phrases like "Uh huh" and "Okay." Brewer then asked Ayala Reyes if he would agree to voluntarily answer questions, to which he responded, "Okay." He also asked the Ayala Reyes to sign a preprinted form indicating he understood and was waiving his rights. The form was written in both English and Spanish. Brewer described the form as a "formality." Ayala Reyes responded, "Oh, well I don't know what you are talking about, but yes." He then signed the form.

Brewer proceeded to interview Ayala Reyes in Spanish for about three hours with several breaks. Ayala Reyes expressed discomfort with proceeding at various points in the interview. His discomfort centered around his fear that MS-13 would retaliate against him if he cooperated with police. At one point, he said, "Do you want me to tell you and then I . . . they'll kill me." At another point, he said, "[I]f I remain quiet, I know that nothing will happen. . . . But if I talk, you know what will happen." He also at times informed Brewer that he would not tell him the things

---

[4] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3

he wanted to know, saying, "I'm not going to say anything," "I'm not going to talk," and other statements to that effect. Brewer nevertheless continued the interview.

The State charged Ayala Reyes with first degree murder, conspiracy to commit first degree murder, and murder in the second degree. During jury selection, Ayala Reyes challenged three jurors for cause. The court denied those challenges. Ayala Reyes instead used peremptory challenges to disqualify those jurors. Ayala Reyes accepted the final panel without using his last peremptory challenge.

A jury found Ayala Reyes guilty of first degree murder, conspiracy to commit first degree murder, and second degree murder. It also found that he was armed with a deadly weapon and had committed the crimes for the benefit of a criminal street gang.

At sentencing, the State conceded that second degree murder was an alternative theory of the case, and therefore the conviction should be vacated. Ayala Reyes argued that his convictions for murder and conspiracy to commit murder constituted the same criminal conduct and should therefore be sentenced concurrently rather than consecutively. The trial court disagreed and ruled that the sentences be served consecutively.

Ayala Reyes appeals.

DISCUSSION

Ayala Reyes makes three arguments. First, he argues the trial court erred in denying his motion to excuse jurors 14, 24, and 39 for demonstrated racial bias. Second, he claims the trial court erred by not suppressing his July 8, 2018

4

interrogation.  Last, he argues that the trial court erred by not treating first degree murder and conspiracy to commit first degree murder as the same criminal conduct.

## I.  Racial Bias

Ayala Reyes argues that the trial court erred in denying his motion to excuse jurors 14, 24, and 39 for demonstrated racial bias.  He claims that because these jurors should have been dismissed for their racial bias, the trial court's failure to do so constituted a structural error that mandates reversal.[5]

In order to successfully challenge a conviction based on errors in jury selection, Ayala Reyes must show that the trial court erred in denying his challenges for cause and he must make a further showing of prejudice.  State v. Fire, 145 Wn.2d 152, 165, 34 P.3d 1218 (2001).  If a defendant utilizes peremptory challenges to cure the trial court's error in not excusing a juror for cause, and is subsequently convicted by a jury upon which no biased juror sat, he has not demonstrated prejudice.  Id.

The facts here fit squarely within Fire.  Id.  Ayala Reyes sought to have allegedly biased jurors disqualified for cause.  The court denied the motion.  Ayala Reyes instead used peremptory challenges to disqualify those jurors.  The biased jurors never sat on the jury.  Ayala Reyes does not take issue with any of the jurors who actually convicted him, only the jurors who he excused with peremptory challenges.  Ayala Reyes therefore has not shown prejudice, and reversal is not

---

[5] For the sake of argument, we assume, without deciding, that the jurors in question demonstrated racial bias and should have been dismissed on Reyes's motion.

required. Fire, 145 Wn.2d at 165. We need not address whether the trial court erred in denying his motions because he is unable to show prejudice.

Unable to secure reversal through a traditional challenge to jury selection, Ayala Reyes urges us to adopt a rule requiring reversal whenever the trial court erroneously denies a motion to excuse a juror for demonstrated racial bias. He claims such an error constitutes a structural error under article I, section 21 of the Washington Constitution. He argues that under Gunwall, article I, section 22, should be read to confer greater protection that its federal counterpart, the Sixth Amendment to the United States Constitution. See State v. Gunwall, 106 Wn.2d 54, 58, 720 P.2d 808 (1986) (laying out the test for greater protection from the state constitution). The Fire court held that "Washington law does not recognize that article I, section 22 of the Washington State Constitution provides more protection than does the Sixth Amendment to the Constitution." Fire, 145 Wn.2d at 163. That ruling is binding on this court. State v. Gore, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) ("[O]nce [the Washington Supreme Court] has decided an issue of state law, that interpretation is binding on all lower courts.").

If we were to consider his argument, Ayala Reyes has not shown structural error. Even assuming that the trial court should have granted Ayala Reyes's motions, the only consequence of its failure to do so is that Ayala Reyes was deprived of three peremptory challenges. Being deprived of peremptory challenges does not constitute structural error unless an objectionable juror actually sits on the jury. See In re Pers. Restraint of Meredith, 191 Wn.2d 300, 310, 422 P.3d 458 (2018).

6

Ayala Reyes is unable to show prejudice or structural error because he utilized his peremptory challenges to remove the jurors he believes were biased. Any error the trial court may have committed in denying his motions to excuse the jurors for cause was therefore harmless.

II. Motion to Suppress

Ayala Reyes argues next that the trial court erred in denying his CrR 3.5 motion to suppress statements he made under interrogation to Brewer.

We review the trial court's findings of fact from a CrR 3.5 hearing for substantial evidence. State v. Gasteazoro-Paniagua, 173 Wn. App. 751, 755, 294 P.3d 857 (2013). We review de novo whether the trial court's conclusions of law are properly derived from its findings of fact. Id. The State must prove a defendant intelligently and voluntarily waived his right to remain silent by a preponderance of the evidence. State v. Woods, 34 Wn. App. 750, 759, 665 P.2d 895 (1983). Where the record indicates there is substantial evidence upon which the trial court could find by a preponderance of evidence that a confession was given voluntarily, the trial court's determination of voluntariness will not be disturbed on appeal. Id.

That a suspect is read his Miranda rights and signs a standard waiver of rights form is "'usually strong proof of the validity of that waiver.'" Id. (quoting North Carolina v. Butler, 441 U.S. 369, 373, 99 S. Ct. 1755, 1757, 60 L. Ed. 2d 286 (1979)). A suspect may invoke his right to remain silent at any time even after initially waiving the right. State v. Piatnitsky, 180 Wn.2d 407, 412, 325 P.3d 167 (2014). An invocation of rights must be an unequivocal expression of an objective intent to cease communication with interrogating officers. Id. The invocation must

be sufficiently clear that a reasonable police officer in the circumstances would understand it to be an invocation of Miranda rights. Id. at 413. The right to remain silent cannot be partially invoked and must be exercised in an objectively clear way. Id. at 412.

A. Waiver

Signing a waiver form is considered strong evidence of a waiver of rights. See Woods, 34 Wn. App. at 759. Here, right before Brewer began explaining his rights to him, he told him he was about to question him about what happened to "a friend of yours," referring to Cruces Vasquez. Then, Brewer explained Ayala Reyes's Miranda rights to him in Spanish at the outset of the interview. When asked if he would sign the form and voluntarily submit to questioning, he said, "I don't know what you are talking about, but yes." At the hearing on his motion to suppress, Ayala Reyes claimed this statement indicated that he did not know what he was signing. But, the record shows that Ayala Reyes had been affirming his understanding of his rights as Brewer explained them to him by saying "[U]h huh" and "Okay" six times. Substantial evidence supports the trial court's determination that Ayala Reyes's statement, "I don't know what you are talking about," referred to what happened to Cruces Vasquez rather than to Ayala Reyes's understanding of his Miranda rights.

We affirm the trial court's finding that Ayala Reyes waived his right to remain silent.

Ayala Reyes nevertheless argues that he reinvoked his right to remain silent at several points during the interview. He identifies five statements he considers to be an invocation of <u>Miranda</u> rights.

First, on page 92 of the first interview transcript, Ayala Reyes and Brewer have the following exchange:

[Brewer:]  What if we start again, and tell me the truth . . . did you talk [to Cruces Vasquez] outside of work?

[Ayala Reyes:] <u>I don't have anything to say.</u>

[Brewer:]  Nothing?

[Ayala Reyes:] I already told you what it is.

[Brewer:]  You told me you didn't talk to him outside of work.

[Ayala Reyes:] Because I didn't.

(Emphasis added) (second alteration in original). Then, on pages 95-104:

[Brewer:]  Where were you going this night? Because you were not sleeping. Because a person can't sleep and call at the same time.

[Ayala Reyes:] Okay. <u>I can't say anything.</u>

[Brewer:]  Why?

[Ayala Reyes:] Because . . .

[Brewer:]  What happens to you if you, you tell us?

[Ayala Reyes:] <u>I can't say anything.</u>

[Brewer:]  Hey, we . . . it's, that is the second time that I tell you . . . what, what were you doing that night right? You were there. You told me you were sleeping. But no. You weren't sleeping. You were talking on your phone. And afterwards, you were talking with someone different. And we know that you closed the phone, you turned the phone off, and you hid the

9

phone or you pu—put the phone in some place, because it isn't turned on this, this night. And this is the time. Jon[a]el [t]his is the time, brother, that you can really explain . . . what happened. Because this night, you already know, and I know that this night you were there, there in your trailer. You weren't sleeping. You were talking on the phone with him. We know that you weren't working. So, yes, it is true that you were talking on the phone outside of work. We know it.

And we know even more . . . but now I'm going to give you the ch—chance to tell. Here, we leave here. We are not going to tell anyone that, that you know what happened. No one. I know it is hard. You have a, a little baby.

[Ayala Reyes:] I know, but what good does it do me? Nothing.

[Brewer:] What do you mean it does you no good?

[Ayala Reyes:] I'm here. You have me, that, where you say that I . . . about what you are saying to me, uh . . . well, I can't say anything.

[Brewer:] Yes. The thing is, I'm giving you the opportunity. And that is difficult, Jon[a]el. I know that. It's difficult. Because what if . . . Here, I'm going to explain to you how it works in the United States. Would you let—let me? All right? Here in the States . . . one of the things that is very important is that you talk to the police, is for a person to show remorse and—and sadness over something that happened. That, that helps. That helps you a lot. But if a person continues without showing remorse, the . . . or, or sadness, uh . . . the others who are going to see the reports say, "Well, this/he is not . . . this/he is not going to help, this person, this man." So, the first step that, that you have to take is to show that something happened, show that there is remorse, there is sadness, and really, that you will never do it again. That won't— that will never happen again. And that is how the law works. That is how the opportunity to receive help works. Because you are young. You are young.

[Ayala Reyes:] I know.

10

[Brewer:]       You have a life.  And we want for you to live it . . . well.

[Ayala Reyes:] But, if I'm not doing bad things to anyone, why do you say that to me?

[Brewer:]       The thing is . . . I can't believe you if you tell me that.  Why did I ask you?  I asked you, besides working with him . . . [unintelligible] outside.  No, no, no.  We didn't/don't talk.  You do talk… a lot.  With text and with calls.  I asked you, "This night, what were you doing?"  [Y]ou say to me, you said to me, "Sleeping."  You were not sleeping right?

[Ayala Reyes:] <u>I can't tell you anything.</u>

[Brewer:]       What is preventing you?  What prevents you?

[Ayala Reyes:] [sighs] Nothing.

[Brewer:]       Someone?  Is someone preventing you?  No.  Jon[a]el, a person is going to be afraid . . . of being here.  I know.  I, I know the . . . I know what life is like.  It's difficult, I know that.  But like from one person, from one human being to another, I'm telling you . . . it's important to tell the law here, the truth.  It's different from El Salvador, dude.  I know how things work there.  Because think it over carefully.  If you are involved in some problem there, do you want to go back there?

[Ayala Reyes:] No.

[Brewer:]       We are talking about that.

[Ayala Reyes:] I don't want to go back to my homeland.

[Brewer:]       I know.  I know what happens there.  I know how, how life is.  No, you have to help . . . to help yourself.  I don't think that . . . I don't think you are a bad person.

[Ayala Reyes:] And I'm not.

[Brewer:]       No.  You . . . you, you are not.  And the truth is that . . . we, as human beings, so . . . sometimes we do things that we don't want to do.  We make mistakes.  I mean, what, what are you?  Tell me that.  What are you?  Are you a . . . a, a bad person, like a monster,

11

someone who is horrible? Or did you make a mistake?

[Ayala Reyes:] I'm not a [m]onster.

[Brewer:] No. I don't think that. We all make mistakes. This was a mistake. You were involved in something, and you made a mistake. But you're not a monster. Do you know who the monsters are? The ones who, who cut people's heads off and hurt people's families.

[Ayala Reyes:] I know.

[Brewer:] So what are you? Jon[a]el . . . a monster, or did you make a mistake?

[Ayala Reyes:] I am not a monster. I know that I am not a monster. [pause]

[Brewer:] If you are not a monster . . . what are you?

[Ayala Reyes:] A human being.

[Brewer:] Yes. And as human beings, we make mistakes. This night, you saw something. We only want to know what you saw. I am not blaming anyone. I want to know what you saw.

[Ayala Reyes:] <u>I am afraid of . . . I'm not going to say anything.</u>

(Emphasis added) (some alterations in original).

None of these statements is an unequivocal invocation of <u>Miranda</u> rights. "[An] invocation of the right to remain silent must be clear and unequivocal (whether through silence or articulation) in order to be effectual; if the invocation is not clear and unequivocal, authorities are under no obligation to stop and ask clarifying questions, but may continue with the interview." <u>State v. Walker</u>, 129 Wn. App. 258, 276, 118 P.3d 935 (2005).

The trial court determined the first claimed invocation was not an invocation at all. Rather, Ayala Reyes was answering the question of whether he spoke to

Cruces Vasquez outside of work by saying he did not because he and Cruces Vasquez had nothing to talk about. We agree. That the statement comes in direct response to Brewer's question, and then Ayala Reyes clarifies again that the two did not speak, making this meaning clear.

The remaining statements are merely expressions of Ayala Reyes's fear of retaliation. In Walker, we observed that a suspect expressing desire not to make incriminating statements was not an unequivocal invocation of Miranda rights: "Garrison did not tell police that he wished to remain silent, but instead said that he did not want to say anything that would make him look guilty or incriminate him. He then continued to speak with police for several hours and signed a highly incriminating statement. At no point in the interview did Garrison stop talking or say that he did not want to talk to police anymore." Id. at 274. Like the defendant in Walker, Ayala Reyes did not say he wished to stop talking to police. To the contrary, he continues talking. And, the more he talks, the more the context makes clear that his hesitance is borne from fear of gang retaliation. At one point in the interview, Ayala Reyes said he "can't talk to you" because of his fear of MS-13. At another point, he said he would have been killed if he had not participated in the murder. When asked who would have killed him, he said, "I am afraid to talk to you about that."

Ayala Reyes's expressed fear of retaliation, coupled with his willingness to continue speaking with police make clear that he, like the defendant in Walker, did not unequivocally invoke his right to remain silent. Brewer was therefore under no obligation to stop the interview, but was free to continue.

13

Ayala Reyes points to no other statements that could constitute an invocation of <u>Miranda</u> rights.  We therefore find that Ayala Reyes explicitly waived his <u>Miranda</u> rights by signing a formal waiver, and did not unequivocally reinvoke those rights at any point in the interview.

B. <u>Voluntariness</u>

Ayala Reyes also argues that his confession was not voluntary and should have been suppressed.

Admission of an involuntary confession violates both the Washington and federal constitutions.  <u>State v. Unga</u>, 165 Wn.2d 95, 100, 196 P.3d 645 (2008).  Whether a confession is voluntary is determined by the totality of the circumstances.  <u>Id.</u> at 101.  Circumstances potentially relevant to this analysis include the "crucial element" of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health, and whether the police advised the defendant of his <u>Miranda</u> rights during the interrogation.  <u>Id.</u>  A promise made by law enforcement does not render a confession involuntary per se, but is instead only one factor to be considered in deciding whether a confession was voluntary.  <u>Id.</u>  The question is whether the interrogating officer's statements were so manipulative or coercive that they deprived the defendant of his ability to make an unconstrained, autonomous decision to confess.  <u>Id.</u> at 102.

Here, Ayala Reyes argues first that Brewer's promise not to "tell anyone" if Ayala Reyes told him who else was involved in the plot is entitled to "specific performance."  He claims that under <u>Unga</u>, Brewer was obligated to keep all

14

statements made during the interview completely confidential, and presumably therefore excluded from use in court.

In Unga, a police officer interviewed a juvenile suspected of vandalizing a vehicle. Id. at 98. During that interview, the police officer told the juvenile that he wouldn't be charged "'with the graffiti'" if he told him about another crime that had to do with graffiti. Id. at 98-99. The juvenile confessed. Id. at 99. The officer referred the case to the prosecutor as a motor vehicle case, thereby keeping his promise. Id. at 107. The prosecutor made an independent decision to charge the juvenile with vehicle prowling and taking a vehicle without permission. Id. at 99. The State later conceded that the vehicle prowl charge should be dismissed in order to be in line with the officer's promise to the juvenile. Id. at 107. Our Supreme Court accepted the concession. Id. at 107.

Ayala Reyes now argues that Unga stands for the proposition that an officer's promises to a suspect are entitled to "specific performance," such that a promise of confidentiality would mandate that the statements be suppressed. This is not so. Rather, the Unga court opined that "a promise made by law enforcement does not render a confession involuntary per se, but instead is only one factor to be considered." Id. at 101.

Weighing the promises the officer made along with the other factors, it is clear that Ayala Reyes's confession was voluntary. First, Ayala Reyes was advised of his Miranda rights at the outset of the interview and signed a formal waiver. Ayala Reyes does not claim that he was under any physical or mental impairment. Ayala Reyes dropped out of school in El Salvador in the fifth grade.

15

But, psychological evaluations indicate the he functions in the "low average range." The interrogation lasted three hours but was broken up by several breaks. The officer was clearly not making a blanket promise of confidentiality for the entire interview. The promise came after Ayala Reyes expressed fear of retaliation for cooperating with law enforcement. Clearly, the officer was merely promising not to tell the other conspirators that Ayala Reyes is the one who told police of their involvement.

Taking these factors together, it is clear that Ayala Reyes's will was not overcome such that his confession was involuntary. Rather, Ayala Reyes chose to cooperate with police and balanced his desire to do so with his fear of gang retaliation. Accordingly, the trial court did not err in denying his motion to suppress the statements he made during the interview.

III. Same Criminal Conduct

Ayala Reyes argues last that the trial court erred in not considering his convictions for first degree murder and conspiracy to commit first degree murder to be the same criminal conduct. "Same criminal conduct" means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim. RCW 9.94A.589(1)(a). A person is guilty of conspiracy when they come to an agreement with others to commit a crime and take a substantial step towards completing the agreement with the intent that the crime occur. RCW 9A.28.040(1). A "substantial step" includes preparatory conduct which furthers the ability of the conspirators to carry out the agreement. State v. Dent, 123 Wn.2d 467, 477, 869 P.2d 392 (1994). A person is guilty of first

16

degree murder when they cause the death of another person with a premeditated intent to do so. RCW 9A.32.030(1)(a). We review a trial court's determination of same criminal conduct for abuse of discretion or misapplication of the law. State v. Graciano, 176 Wn.2d 531, 535, 295 P.3d 219 (2013).

Here, it is clear the two crimes did not take place in the same time and place. The murder occurred on a Tacoma street. The agreement existed well before the murder, in text messages between Ayala Reyes and Sicario days before the murder itself, and in a meeting of the four conspirators at Ayala Reyes's apartment on the day of the murder. Given the fact that Ayala Reyes brought gloves to the meeting for the group to use during the murder, the meeting that day constituted a substantial step towards completion of the conspiracy.

The crimes did not take place at the same time and place. Thus, the trial court did not abuse its discretion in finding the two crimes were not the same criminal conduct.

We affirm.

_Appelwick, J._

WE CONCUR: